**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| PENFORD CORPORATION<br>7094 S. Revere Parkway<br>Centennial, CO 80112,<br><br>and<br><br>PENFORD PRODUCTS CO.<br>1001 First Street, S.W.<br>Cedar Rapids, IA 52404,<br><br>        Plaintiffs,<br><br>        vs.<br><br>NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA<br>70 Pine Street<br>New York, NY 10270,<br><br>and<br><br>ACE AMERICAN INSURANCE COMPANY<br>436 Walnut Street<br>Philadelphia, PA 19106,<br><br>        Defendants. | Case No.  1:09-cv-13<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Penford Corporation and Penford Products Co. (collectively, "Penford"), by its

undersigned counsel, bring this action against Defendants National Union Fire Insurance

Company of Pittsburgh, Pennsylvania ("National Union") and ACE American Insurance

Company ("ACE") (collectively, "Defendant Insurance Companies"), and in support thereof,

alleges as follows:

### I.  THE NATURE OF THE ACTION

1.      Penford brings this insurance coverage action against Defendant Insurance

Companies for declaratory judgment pursuant to 28 U.S.C. § 2201, and for damages for breach of contract and bad faith conduct. Penford seeks to have this Court declare the rights of Penford and the responsibilities of Defendant Insurance Companies under Penford's insurance coverage. Penford seeks payment of more than $50,000,000 under coverages for property damage, Time Element and various other exposures for costs incurred as a result of a record flooding of the Cedar River in Cedar Rapids, Iowa in June 2008 (the "June 2008 Flood"). Penford also seeks relief for Defendant Insurance Companies' breach of their contractual obligations and their bad faith conduct in adjusting and handling Penford's claim.

2.      Penford conducts manufacturing operations at its Cedar Rapids Plant, a facility in Cedar Rapids Iowa. The Cedar Rapids Plant suffered substantial property damage from the June 2008 Flood. Further, property damage at the Cedar Rapids Plant rendered normal operation of that plant impossible for an extended period, causing Penford to suffer Time Element losses of profit, Extra Expense and continuing unearned expense. Further, surrounding conditions in the wake of the flooding, including orders of civil authorities, lack of access to the Cedar Rapids Plant and interrupted utility services made normal operations impossible for a lengthy period.

3.      Penford gave immediate notice of its June 2008 Flood losses, and sought insurance recovery from Defendant Insurance Companies. On a continuing basis, Penford kept Defendant Insurance Companies informed of the growing magnitude of Penford's loss and of its out-of-pocket payments, and Penford repeatedly requested payments of amounts indisputably owed. Further, Penford informed Defendant Insurance Companies that their failure to pay meaningful sums on a timely basis was causing, and would continue to cause, additional financial harm to Penford. Despite this, Defendant Insurance Companies refused to pay undisputed amounts on a timely basis.

4.      Defendant Insurance Companies eventually paid $20,000,000 for property damage at the Cedar Rapids Plant, but have informed Penford that their obligations are largely capped by two $10,000,000 sublimits applicable to flood in two zones at the Cedar Rapids Plant. Accordingly, Defendant Insurance Companies have argued that they owe essentially nothing for Time Element losses at the Cedar Rapids Plant.

5.      While conceding that property damage entirely confined to a particular zone is subject to the $10,000,000 sublimit for that zone, Penford has repeatedly made clear that neither it's covered Time Element losses nor any of a host of other broad, overlapping coverages for various other exposures are subject to those sublimits.

6.      Penford has brought this Complaint to enforce its rights to full coverage for its losses, and Penford seeks a declaration of its rights to insurance coverage sold by Defendant Insurance Companies, along with direct and consequential damages for Defendant Insurance Companies' breach of contract and punitive damages for Defendant Insurance Companies' bad faith conduct.

## II.  THE PARTIES

7.      Plaintiff Penford Corporation is a corporation incorporated under the laws of the State of Washington with a principal place of business located at 7094 S. Revere Parkway, Centennial, Colorado 80112.

8.      Plaintiff Penford Products Co. ("Penford Products") is a corporation incorporated under the laws of the State of Delaware with a principal place of business located at 1001 First Street S.W., Cedar Rapids, Iowa 52404.

9.      Defendant National Union is a corporation incorporated under the laws of the Commonwealth of Pennsylvania, maintains its principal place of business at 70 Pine Street, New

York, New York 10270, and is licensed to transact and does transact business in the State of Iowa.

10.     Defendant ACE is a corporation incorporated under the laws of the Commonwealth of Pennsylvania, maintains its principal place of business at 436 Walnut Street, Philadelphia, Pennsylvania 19106, and is licensed to transact and does transact business in the State of Iowa.

### III.  JURISDICTION AND VENUE

11.     Federal subject matter jurisdiction exists under 28 U.S.C. § 1332 in that the named parties to this action are of complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12.     Venue is proper in this State pursuant to 28 U.S.C. § 1391 because this State has personal jurisdiction over Defendant Insurance Companies and a substantial part of the events or omissions giving rise to the claim occurred in this State.

### IV.  THE POLICY

13.     Defendants ACE and National Union sold to Penford policies PGLN0429063 and 23632613, respectively, for the policy period March 1, 2008 to March 1, 2009.  These policies were in all relevant respects identical and this Complaint will, hereafter, refer to them collectively, as the "Policy."  A true and correct copy of the Policy is attached as Exhibit **A** hereto.

### A.     The Premium and Limits

14.     Penford paid $655,848 in premium for the Policy, Ex. **A** at 7, and Penford has paid all premiums due under the Policy.

15.     The Policy provides $300,000,000 in all risk property insurance coverage.

National Union subscribed to 50% of liability, or $150,000,000 part of $300,000,000. ACE subscribed to the other 50% of liability, or $150,000,000 part of $300,000,000. Ex. **A** at 5.

**B.** **The Covered Causes of Loss**

16.    The Policy is an "all risk" form, insuring "against all risks of sudden and accidental direct physical loss or damage, except as excluded, to property described herein while on 'insured locations', provided such direct physical loss or damage occurs during the term of this 'policy' commencing with the effective date shown above." Ex. **A** at 5.

17.    No part of the losses for which Penford seeks coverage under the Policy is excluded by the Policy.

**C.** **The Property Insured**

18.    Damage to real and/or personal property is covered under the Policy:

**PROPERTY INSURED**

This "policy insures" the following property, unless otherwise excluded elsewhere in this "policy", located at an "insured location" or within 1,000 feet thereof, to the extent of the interest of the Insured in such property.

A.    Real Property, including new buildings and additions under construction at an "insured location", in which the Insured has an insurable interest, except the ethanol plant under construction at Cedar Rapids, IA location.

B.    Personal Property:

1)    owned by the Insured, including the Insured's interest as a tenant in improvements and betterments. In the event of direct physical loss or damage, the "company" agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

2)    of officers and employees of the Insured.

- 5 -

3)    of others in the Insured's custody to the extent the Insured is under obligation to keep insured for direct physical loss or damage insured by this "policy".

4)    of others in the Insured's custody to the extent of the Insured's legal liability for direct physical loss or damage to Personal Property.

Ex. **A** at 9.

**D.**    **The Sublimits**

19.    The Policy lists, among others, the following Sublimits:

| Coverage | Sublimits |
|---|---|
| Flood per occurrence and annual aggregate | $50,000,000 |
| Flood at Cedar Rapids, IA Facility Zone A | $10,000,000 |
| Flood at Cedar Rapids, IA Facility Zone B | $10,000,000 |
| Civil/Military Authority | 30 days not to exceed 5 miles |
| Contingent Time Element | $10,000,000 |
| Extra Expense | $20,000,000 |
| Ingress/Egress | $1,000,000 |
| Service Interruption | $20,000,000 |
| On Premises Services | n/a |
| Debris Removal | $10,000,000 or 25% whichever is greater |

| Decontamination Costs | n/a |
|---|---|
| Land and Water Contaminant or Pollutant Cleanup, Removal and Disposal | $1,000,000 |
| Extended Period of Indemnity | 90 Days |
| Professional Fees (100% of the first $250,000 and then 50% of the amount above $250,000 up to the amount of $1,000,000) | $1,000,000 |

Ex. **A** at 6-7.

20.     The Policy purports to explain the above Sublimits as they relate to the Limit of Liability:

> These Sublimits do not increase the Limit of Liability or any other Sublimit. The "company" shall not be liable for more than the Sublimit specified for such extension, endorsement, or Section in any one "occurrence" regardless of the number of "locations" or coverages involved in the "occurrence".
>
> Sublimits stated below apply per "occurrence" for all "locations" and coverages involved.
>
> The maximum Sublimit amount collectible under this "policy" shall be the Sublimit applicable for all loss or damage resulting from a peril insured against by this "policy," regardless of any other Sublimit involved in this "policy".

Ex. **A** at 5.

21.     Endorsement 3 to the Policy defines Cedar Rapids Flood Zone A and Cedar Rapids Flood Zone B referenced in the Sublimits:

### ENDORSEMENT 3

### CEDAR RAPIDS FLOOD ZONE DEFINITIONS

The following flood areas for the Cedar Rapids, IA location are defined per the Flood Insurance Rate Map 1901870020 as follows:

**Zone A**

This definition shall apply to all insured Real and Personal Property (buildings, tanks, equipment, structures, etc.) in the area bounded on the west by the railroad tracks that border the western exterior wall of Building No. 69, through Building No. 58A and west of Buildings Nos. 9, 9A, 11 and 11A, on the south by Riverside Park Drive, on the east by the Cedar River, and on the north by the railroad tracks running on a line 9th Avenue extended and between the main plant complex and the Dextrose facilities. Any real and personal property located on the boundary or in close proximity so as to pose a dispute shall be considered to be in Zone A.

**Zone B**

This definition shall apply to all Real and Personal Property (buildings, tanks, equipment, structures, etc.) in the remaining insured areas east of 1st Street.

Ex. **A** at Endorsement 3.

22.     The Policy does not define Cedar Rapids Flood Zone C.

**E.      The Deductible**

23.     Of relevance to this action, the Policy provides the following deductible:

As respects Flood at Cedar Rapids, IA $500,000 Property Damage and 15 X 100% Plant ADV Time Element subject to a minimum $1,000,000 Combined Property Damage & Time Element

Ex. **A** at 8.

**F.      The Time Element Coverages**

24.     The Policy provides certain Time Element Coverages, including Gross Earnings and Extra Expense.

25.     The Policy provides business income coverage on a Gross Earnings basis metered on the performance of the "business" at Insured Locations:

**GROSS EARNINGS**

As respects "insured locations",

1)      Measurement of Loss:

a)  The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

    (i)  Gross Earnings;

    (ii)  less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

    (iii)  plus all other earnings derived from the operation of the business.

b)  In determining the indemnity payable as the Actual Loss Sustained, the "company" will consider the continuation of only those normal charges and expenses that would have been incurred had no interruption of production or suspension of business operations or services occurred.

c)  There is recovery hereunder but only to the extent that the Insured is:

    (i)  wholly or partially prevented from producing goods or continuing business operations or services;

    (ii)  unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

    (iii)  unable to continue such operations or services during the PERIOD OF LIABILITY; and

    (iv)  able to demonstrate a loss of sales for the operations, services or production prevented.

Ex. **A** at 27-28. The Cedar Rapids Plant is an "Insured Location."

26.  It is established in Iowa and elsewhere that the purpose of Time Element insurance of the type provided by the Policy is to do for the policyholder what it would have done had there been no loss. Gross Earnings coverage of the type provided by the Policy is

capable of being calculated immediately after the loss and is owed promptly so as to do for the policyholder what it would have done had there been no catastrophe and to avoid additional, consequential losses caused by lack of unreimbursed income.

27.     The Policy provides the following Extra Expense coverage, again metered with regard to the Insured's costs to conduct the "Insured's business":

**EXTRA EXPENSE**

1)      Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

a)      Extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and

b)      Extra costs of temporarily using property or facilities of the Insured or others,

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

Ex. **A** at 30.

28.     The Loss Insured provision of the Time Element Coverage notes that recovery is metered based on "the experience of the business before and after and the probable experience during the Period of Liability." Ex. **A** at 27. This provision further allows offset of Time Element Loss based on mitigation at other Insured Locations or other locations. Ex. **A** at 27.

**G.      The Time Element Coverage Extensions**

29.     The Policy also affords certain Time Element Coverage Extensions, including Contingent Time Element, Service Interruption Time Element, On Premises Services, Civil or Military Authority, and Ingress/Egress.

30.     The Policy provides the following Contingent Time Element Coverage:

**CONTINGENT TIME ELEMENT**

This "policy" covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY:

1)      directly resulting from physical loss or damage of the type insured; and

2)      to property of the type insured,

at any locations, within the TERRITORY of this "policy", of direct suppliers or customers with whom the insured has a contractual obligation to receive goods or services, or provide goods or services.

Ex. **A** at 33.

31.     The Policy provides the following Service Interruption Time Element Coverage:

**SERVICE INTERRUPTION TIME ELEMENT**

1)      This "policy" covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the Period of Service Interruption at "insured locations" when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service as a direct result of physical damage of the type insured by this "policy" to the facilities of the supplier of such service located within the "policy" TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

Ex. **A** at 34.

32.     The Policy provides the following On Premises Services coverage:

**ON PREMISES SERVICES**

This "policy" covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet of the "insured location":

1)      Electrical equipment and equipment used for the transmission of voice, data or video.

2)      Electrical, fuel, gas, water, steam, refrigeration, sewerage,

voice, data or video transmission lines.

Ex. **A** at 34.

33.    The Policy provides Civil or Military Authority coverage as part of the definition

of Period of Liability:

> 7.    If an order of CIVIL or MILITARY AUTHORITY specifically prohibits access to the "insured location" and provided such order is the direct result of physical damage of the type insured against under this "policy" at the "insured location" or within 5 miles of it, the period of time:
>
> a)    starting at the time of such direct physical damage; but
>
> b)    not to exceed the number of consecutive days shown in the LIMITS clause of the DECLARATIONS section.

Ex. **A** at 36.  Although technically part of the definition of the Period of Liability, this Complaint

will refer to Civil or Military Authority coverage as a Time Element Coverage Extension.

34.    The Policy provides the following Ingress/Egress coverage:

> **INGRESS/EGRESS**
>
> This "policy" covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured, due to the necessary interruption of the Insured's business due to prevention of ingress to or egress from an "insured location", whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured by this "policy" to property within 5 miles of the "insured location", to the kind of property not excluded by this "policy".

Ex. **A** at 33.

35.    The Policy provides that "Service Interruption," Civil or Military Authority, and

Ingress/Egress coverages are all subject to a 48-hour Waiting Period. Ex. **A** at 7.

**H.**    **The Period of Liability**

36.    The Policy defines Period of Liability for the Time Element Coverages as

follows:

**PERIOD OF LIABILITY**

A.     The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except GROSS PROFIT and LEASEHOLD INTEREST and as shown below, or if otherwise provided under the TIME ELEMENT EXTENSIONS, in as follows:

1.     For building and equipment, the period:

    a)     starting from the time of direct physical loss or damage of the type insured against; and

    b)     ending when with due diligence and dispatch the building and equipment could be:

        (i)     repaired or replaced; and

        (ii)     made ready for operations;

        under the same or equivalent physical and operating conditions that existed prior to the damage.

    c)     not to be limited by the expiration of this "policy."

Ex. **A** at 35.

37.     The Policy further contains the following Extended Period of Liability coverage:

**EXTENDED PERIOD OF LIABILITY**

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1)     the interruption of business as covered by GROSS EARNINGS;

2)     for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred; and

3)     commencing with the date on which the liability of the "company" for loss resulting from interruption of business would terminate if this Extension had not been included herein.

Ex. **A** at 33. This provision is technically a Time Element Coverage Extension under the Policy,

but this Complaint will treat it with the Period of Liability.

### I.   <u>Additional Coverages</u>

38.     The Policy also provides Additional Coverages for Debris Removal, Decontamination Costs, Land and Water Contaminant or Pollutant Cleanup, Removal and Disposal and Professional Fees.

39.     The Debris Removal provision provides:

**DEBRIS REMOVAL**

This "policy" covers the reasonable and necessary costs incurred to remove debris from an "insured location" that remains as a direct result of direct physical loss or damage insured by this "policy".

This Additional Coverage does not cover the costs of removal of:

1)      contaminated uninsured property; or

2)      the "contaminant" in or on uninsured property,

whether or not the "contamination" results from insured direct physical loss or damage.

Ex. **A** at 13.

40.     The Decontamination Costs provision provides:

**DECONTAMINATION COSTS**

If the insured property is contaminated as a direct result of physical damage to the insured property and there is in force at the time of the loss any law or ordinance regulating "contamination", including but not limited to the presence of "pollution" or "hazardous material", then this "policy" covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. This Additional Coverage applies only to that part of insured property so contaminated as a direct result of insured physical damage.

The "company" is not liable for the costs required for removing contaminated uninsured property nor the "contaminant" therein or thereon, whether or not the "contamination" results from an insured event.

Ex. A at 13-14.

41.    The Land and Water Contaminant or Pollutant Cleanup, Removal and Disposal

provision states:

> **Land and Water Contaminant or Pollutant Cleanup, Removal and Disposal**
>
> This "policy" covers the reasonable and necessary cost for the cleanup, removal and disposal of "contaminants" or "pollutants" from uninsured property consisting of land, water or any other substance in or on land at the "insured location" if the release, discharge or dispersal of "contaminants" or "pollutants" is a direct result of insured physical loss or damage to insured property.

Ex. A at 16-17.

42.    The Professional Fees provision states:

> **PROFESSIONAL FEES**
>
> This "policy" covers the actual costs incurred by the Insured, of reasonable fees payable to the Insured's accountants, architects, auditors, engineers, or other professionals, excluding the cost of using the Insured's employees, for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the "company" resulting from insured loss payable under this "policy" for which the "company" has accepted liability.

Ex. A at 18.

**J.    Penford's Rights under the Policy**

43.    By reason of their sale of the Policy, Defendant Insurance Companies owe fiduciary duties and duties of good faith and fair dealing to Penford.

44.    Penford has satisfied all conditions precedent to obtaining coverage for its losses stemming from the June 2008 Flood under the Policy.

45.    Penford is entitled to coverage under a number of provisions in the Policy, many of which overlap.  There is no provision in the Policy governing the manner in which Penford can structure its claim when multiple coverage provisions apply.  Where more than one policy

limit is applicable, Penford is entitled to access multiple limits in order to be made whole for its insured loss.

## V. **THE FACTUAL BACKGROUND**

### 1. **Penford's Operations at the Cedar Rapids Plant**

46.     Penford Corporation develops, manufactures and markets specialty natural-based ingredient systems for various applications.

47.     Penford Products, a wholly owned subsidiary of Penford Corporation, operates Penford's largest manufacturing plant – the Cedar Rapids Plant – located in Cedar Rapids, Iowa. The Cedar Rapids Plant accounted for approximately 50% of Penford's revenue in its last fiscal year.

48.     The Cedar Rapids Plant manufactures and supplies various types of starch-based products, including industrial and specialty starches, ethanol and dextrose products, as well as co-products derived from corn, such as germ, gluten and wet feed.

49.     The Cedar Rapids Plant is a complex of about 70 buildings and associated equipment spread throughout three zones:  Zone A (roughly the 100-year flood level); Zone B (roughly the 500-year flood level); and Zone C.

50.     The Cedar Rapids Plant uses corn, purchased from farms and other suppliers in the area, to make its products.  The corn is delivered to buildings in Zone B and treated in buildings in Zone B.  The treated corn is then transferred to buildings in Zone A which, through various processes, finalize its conversion to intermediate and end products.  Some of these end products are sent to customers directly from buildings in Zone A, other end products are sent back to buildings in Zone B from which they are sent to customers.

51.     Certain amounts of intermediate products manufactured in Zone A are transferred

to buildings in Zone C, where they are further processed and packaged into specialty end products, such as liquid natural additives ("LNA"). Zone C, in addition to containing the LNA operating facility, consists of multiple buildings that constitute the Research and Development laboratories at the Cedar Rapids Plant.

52. End products manufactured at the Cedar Rapids Plant are delivered to users all over the world.

53. In the course of manufacture, each end product manufactured by Penford undergoes processes in at least two Zones of the Cedar Rapids Plant. In other words, Penford cannot manufacture or sell any end product through operation of property in only one Zone (A, B or C) at the Cedar Rapids Plant.

### 2. Penford's Losses Arising Out of the Events of June 11, 2008

54. On June 11, 2008, the Cedar River in Cedar Rapids, Iowa, which is adjacent to Penford's Cedar Rapids Plant, began to flood. The Cedar River crested on June 13, 2008 at nearly 32 feet, 12 feet higher than the previous record set in the late 1920s.

55. As a result of such historic record flooding, property at the Cedar Rapids Plant suffered severe damage.

56. Penford incurred Time Element loss as a result of the aforementioned property damage. Penford's loss of Gross Earnings was $14,630,668 through the end of August, 2008. Gross Earnings losses will continue until Penford can restore its business to the condition it enjoyed prior to the June 2008 Flood. Further, Penford has incurred and continues to incur substantial costs and Extra Expenses, including costs in attempting to assure that the requirements of its customers were met, renting additional boilers and hiring extra security. To date, these costs are approximately $1,000,000.

57.    The June 2008 Flood also caused damage to Penford's suppliers and customers, including but not limited to, damage to the farmers supplying corn to Penford.

58.    Services at the Cedar Rapids Plant were also interrupted. Penford was without gas service, which is needed to generate steam used to manufacture starch and for other purposes, from June 11, 2008 to July 29, 2008. Penford was also without electric service, which is required to power the equipment in the plant, from June 12, 2008 to July 23, 2008, with a second power restoration occurring on August 2, 2008.

59.    Access to the Cedar Rapids plant was prevented as a result of the mandatory evacuation orders issued by the City of Cedar Rapids for areas located inside the 500 year flood plain.

60.    Further, ingress to, and egress from, parts of the Cedar Rapids Plant was prevented for weeks because of substantial remaining flood water.

61.    Penford has also had to incur, and will continue to incur, additional costs at the Cedar Rapids Plant, such as debris removal, decontamination, land and water contaminant or pollutant cleanup, removal and disposal.

62.    Penford has also incurred various professional fees in presenting its claim to Defendant Insurance Companies.

### 3.   Defendant Insurance Companies' Response to Penford's Claim

63.    Penford gave immediate notice to Defendant Insurance Companies of its damage and losses from the June 2008 Flood. At this time, given the widespread damage, it was clear that Penford's loss would be many tens of millions of dollars.

64.    Defendant Insurance Companies hired an adjuster, Sean Corrigan of GAB Robins North America, Inc. ("GAB").

65.     By letter dated July 14, 2008, Penford, through its broker, Marsh, provided its first Preliminary Claim Submission to GAB, estimating Time Element losses through August, 31, 2008 of $14,995,326 and seeking payment in the amount of $14,995,326.

66.     Penford received payments in the amount of $1,250,000 from National Union on July 29, 2008, and $1,250,000 million from ACE on August 15, 2008, both for property damage.

67.     On August 20, 2008, Penford provided a second Preliminary Claim Submission, which demonstrated that, as of that date, Penford's loss exceeded $28,000,000; specifically, this submission detailed inventory loss and labor costs of more than $1,000,000, paid invoices of nearly $12,000,000, and a Time Element loss through the end of August of more than $15,000,000.   This second Preliminary Claim Submission sought a further payment of $7,500,000, to be paid by the end of August 2008.

68.     Defendant Insurance Companies orally denied Penford's request for a further payment of $7,500,000, stating it was "premature."

69.     By letter of September 9, 2008, Penford noted that its August 20, 2008 letter had demonstrated an existing loss of more than $28,000,000, and stated that its ultimate loss could exceed $50,000,000.  Penford further stated that the refusal of Defendant Insurance Companies to pay anything beyond $2,500,000, or to pay its lost Gross Earnings as they would have been earned, had caused Penford to incur financing costs which it would seek from Defendant Insurance Companies.  Penford closed this letter by repeating its request for an immediate payment of another $7,500,000.

70.     By letter of September 23, 2008, Penford explained, at length, why it was entitled to:

> (1)     coverage for damage to property exclusively within Zone A, capped at the $10,000,000 sublimit for "Flood at Cedar Rapids,

IA Facility Zone A";

(2)     coverage for damage to property exclusively within Zone B, capped at the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone B";

(3)     coverage for damage to property within Zone C or otherwise not exclusively within Zone A or Zone B, subject to the $50,000,000 sublimit for "Flood per occurrence and annual aggregate";

(4)     Civil Authority coverage from June 14 to the period when the orders were lifted, subject to a 30 day sublimit; Ingress/Egress coverage from the period the Civil Authority orders were lifted until ingress and egress were unimpeded, subject to a $1,000,000 sublimit; and Service Interruption coverage from the date when ingress and egress were unimpeded until normal service was returned, subject to a $20,000,000 sublimit;

(5)     Contingent time element for loss stemming from damage to suppliers, subject to a $20,000,000 sublimit;

(6)     Time Element coverage subject to a 15X 100% Plant ADV Time Element deductible, and the $50,000,000 overall sublimit for "Flood per occurrence and annual aggregate" and the $20,000,000 sublimit for Extra Expense;

(7)     Debris Removal, Decontamination, Land and Water Contaminant, Pollutant Cleanup, and Removal and Disposal coverage, subject to their specific sublimits; and

(8)     Professional Fees.

Penford stated, as of the date of the letter, it had incurred $30,396,589 in costs, but had received only $2,500,000 in payments. This letter requested a written coverage position from Defendant Insurance Companies. This letter closed by requesting that Defendant Insurance Companies pay further undisputed sums, and suggesting a meeting of principals to settle the claim.

71.     By letter of October 1, 2008, GAB noted that, nearly three weeks earlier, it had recommended a second payment of an "unquestioned $8 million" and attached Partial Proofs of Loss for this amount. The three-week delay was otherwise unexplained. GAB stated – incorrectly – that it was not in possession of information relative to the Time Element claim;

accordingly, the "unquestioned $8 million" reflected only property damage.

72.     By letter of October 13, 2008, Penford noted the ongoing harm Defendant Insurance Companies' refusal to payment covered sums was causing Penford and requested a formal coverage position in response to Penford's letter of September 23, 2008.

73.     By letter of October 14, 2008, Defendant Insurance Companies purported to respond to Penford's letter of September 23, 2008, refusing to provide "a definitive coverage position," but stating that they would "provide Penford with a formal coverage position as soon as they are able to do so."

74.     On October 23, 2008, Defendant Insurance Companies finally paid an additional $8,000,000 – promised three weeks earlier and apparently submitted three weeks before that – bringing the total paid to $10,500,000.

75.     By letter of November 3, 2008, Penford responded to the informal coverage positions taken by the Defendant Insurance Companies in their letter of October 14, 2008, noted its submission of documents relative to its Time Element loss through August had established a loss of nearly $15,000,000, and asked when it would receive another payment.  This letter again suggested a meeting of principals.

76.     By letter of November 6, 2008, Penford timely responded to certain questions in Defendant Insurance Companies' letter of October 14, 2008, again requesting a meeting of principals either to resolve the case or secure additional payments to mitigate the ongoing financial harm Penford was incurring by financing recovery itself.

77.     By letter dated November 13, 2008, Defendant Insurance Companies advised Penford that a further payment in the amount of $4,000,000 would be forthcoming.  This letter stated Defendant Insurance Company's position that Penford was entitled to recover for Time

Element Loss and property damage capped by the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone A" and the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone B," and took the position that because operations in Zone C were impossible given damage to property in Zones A and B, Time Element loss in Zone C was subject to the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone A" and the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone B." In other words, Defendant Insurance Companies took the position that all Time Element coverage for loss at the Cedar Rapids Plant was capped at $20,000,000. This letter further contended that Civil Authority, Ingress/Egress and Service Interruption coverages were subject to the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone A" and the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone B," but that if they were not, Defendant Insurance Companies were "at a loss to understand how these coverages afford Penford anything more than 2 to 4 days of coverage." This letter further questioned whether coverage was afforded under the Off Premises Services or Service Interruption Time Element coverages.

78.    On November 20, 2008, Penford addressed certain points made the Defendant Insurance Companies' letter of November 13, confirmed that the promised $4,000,000 payment was for property damage, and requested additional payment of Time Element loss, which Penford had long established was nearly $15,000,000 merely through August 2008.

79.    Spreadsheets prepared by GAB Robins and produced to Penford indicate that Defendant Insurance Companies' adjuster has valued Penford's claim at approximately $26,000,000 for property damage and extra expenses as of November 2008.

80.    Penford did not receive the $4,000,000 payment promised in the November 13, 2008 letter until November 28, 2008, bringing the total paid to $14,500,000, well short of the

more than $26,000,000 recommended by GAB Robins.

81.    By letter of December 2, 2008, Defendant Insurance Companies, addressing the $26,000,000 estimate of GAB Robins, acknowledged that they owed an additional $5,500,000 (net of a claim by a third party). In this letter, Defendant Insurance Companies took the position that the "vast majority" of Penford's Time Element losses were "subject to the Flood Zone A and B sublimits."

82.    Payments totaling $17,500,000 were received on October 23, 2008, November 28, 2008, and December 29, 2008, bringing the total paid to $20,000.000. According to Defendant Insurance Companies, all payments have been for property damage. Defendant Insurance Companies have not paid any money to date for the Time Element losses Penford has been incurring continually since June 11, 2008.

83.    Defendant Insurance Companies have intimated that their coverage obligations do not extend to any losses beyond the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone A" and the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone B," and some amount of loss unilaterally allocated by Defendant Insurance Companies to Zone C.

84.    On December 5, 2008, the parties held a meeting in New York to discuss coverage issues and reach a resolution of Penford's insurance claim. The parties failed to reach a resolution at that meeting.

### 4. Defendant Insurance Companies' Refusals To Make Payments of Undisputed Amounts in a Timely Manner Have Caused Penford To Suffer Consequential Damages

85.    Penford incurred substantial out-of-pocket costs from the June 2008 Flood, including the costs to repair and replace property and various Extra Expenses. Simultaneously, it lost its flow of income from operation of the Cedar Rapids Plant, although various operating expenses continued.

86.     Penford repeatedly demonstrated the magnitude of its losses to Defendant Insurance Companies and requested payments of undisputed amounts.

87.     Defendant Insurance Companies repeatedly refused to make payments of undisputed amounts, and the payments they did make were insufficient and untimely.

88.     Penford repeatedly informed Defendant Insurance Companies that their failure to provide sufficient and timely payments of undisputed amounts caused ongoing financial injury to Penford. These costs included the following:

> (1)     The cost of purchasing a waiver from Penford's lenders of the financial covenants in its credit facility;
>
> (2)     An increase in the rate of interest charged in Penford's credit facility; and
>
> (3)     Interest on the millions of dollars spent to date by Penford (offset to a degree by the payments of undisputed amounts made by Defendant Insurance Companies).

89.     When the Defendant Insurance Companies sold the Policy, they and Penford understood that, if the Defendant Insurance Companies breached the Policy by refusing to pay amounts owed on a timely basis, Penford would suffer additional, consequential damages of the type detailed in paragraph 88.

90.     Under Iowa law, "Unfair claim settlement practices" include "Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear" and "Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage." I.C.A. § 507B.4.

### 5. The Amount Defendant Insurance Companies Owe Penford

91.     Penford has advised Defendant Insurance Companies that its losses arising from the June 11, 2008 events are currently $50,643,958 and will exceed $56,000,000. To date,

Defendant Insurance Companies have paid Penford $20,000,000.

## VI.    THE CONTROVERSY

92.    Penford now seeks a declaratory judgment from this Court finding that Defendant Insurance Companies must provide insurance proceeds to Penford for its claim for losses from the June 2008 Flood, as well as a finding that Defendant Insurance Companies' positions constitute a breach of the Policy and that it has committed other breaches of the Policy. Penford further seeks direct and consequential damages from Defendant Insurance Companies' breach, and punitive damages from Defendant Insurance Companies bad faith breach of contract.

93.    To the extent that Penford can understand them, Defendant Insurance Companies' refusal to pay Penford's full loss appears to be based on three arguments.

94.    First, Defendant Insurance Companies contend that Penford's Time Element Loss is largely subject to a $20,000,000 cap; namely, the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone A" and the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone B." This is incorrect for a number of reasons including the following:

(a)    Gross Earnings – one component of Time Element coverage – at the Cedar Rapids Plant are earned plant wide; it is impossible for earnings to be earned by operation of property in one Zone of the plant, nor is it possible to compute charges and expenses that do not necessarily continue for any Zone of the plant;

(b)    Relatedly, the Policy provides that Gross Earnings "for manufacturing operations" is "the net sales value of production less the cost of raw stock, materials and supplies used in such production"; neither net sales nor cost of raw stock can be attributed to a particular Zone at the Cedar Rapids Plant;

(c)    Accordingly, the Measurement of the Loss provision of the Gross Earnings Time Element Coverage notes that loss is measured by earnings derived from "operation of the business";

(d)    It was impossible for Penford to manufacture any product solely in one Zone of the Cedar Rapids Plant;

(e)     The deductible for Time Element is metered by the Cedar Rapids Plant Average Daily Value, and not any average daily value attributable to any Zone in the plant;

(f)     Other terms in the Policy, such as Time Element Interdependency, demonstrate that Time Element coverage is metered by loss at Insured Locations and not by loss at any particular Zone in an insured location;

(g)     Further, the Loss Insured provision of the Time Element Coverage notes that recovery is metered based on "the experience of the business" as a whole and not some portion of the business allocated to particular Zones at an insured location;

(h)     By the terms of the introductory language, the $10,000,000 sublimits apply only if the sublimit applies to "all loss or damage resulting from a peril insured against," and neither $10,000,000 sublimit can apply to all Time Element loss;

(i)     The specific Cedar Rapids Flood Zone Definitions apply only to real and personal property and not Time Element;

(j)     Extra Expense – another component of Time Element coverage – is not tied to and could not be tied to any particular Zone, but relates to expenses incurred in relation to the conduct of the Insured's business;

(k)     The Extended Period of Liability is metered by the time needed to restore the policyholder's "business" and not tied to any particular Zone;

(l)     Other Time Element coverages – such as Commissions, Profits and Royalties – demonstrate that Time Element coverage provided by the Policy is not designed to be and cannot be tied to property in any particular Zone at the Cedar Rapids Plant;

(m)     It would be artificial and impractical to assign or allocate "net sales value," "cost of raw stock," earnings from the "operation of business," or "experience of the business" to one or more Zones at the Cedar Rapids Plant; and

(n)     At a minimum, the Policy is ambiguous as to whether Time Element coverages are subject to the $10,000,000 sublimits, and this ambiguity must be construed against Defendant Insurance Companies as drafters of the Policy.

95.     Second, Defendant Insurance Companies contend that Penford's claims under the

Time Element Coverage Extensions (Contingent Time Element, Service Interruption Time Element, On Premises Services, Civil or Military Authority and Ingress/Egress) and Additional Coverages (Debris Removal, Decontamination Costs, Land and Water Contaminant or Pollutant Cleanup are Removal and Disposal) are subject to a $20,000,000 cap; namely, the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone A" and the $10,000,000 sublimit for "Flood at Cedar Rapids, IA Facility Zone B." Defendant Insurance Companies are wrong for at least five reasons:

(a)     By their very terms, many of the Time Element Coverage Extensions cannot relate to property in any particular Zone of the Cedar Rapids Plant; for instance, Contingent Time Element refers to loss to the "Insured" stemming from damage to property of others;

(b)     As with the Time Element Coverages themselves, the Time Element Coverage Extensions refer to loss incurred by the Insured due to effects on the "Insured's business" at an "insured location"; for instance, Ingress Egress coverage refers to loss to the "Insured" due to interruption of the "Insured's business" due to prevention of access to an "insured location" due to damage to property within 5 miles of the "insured location";

(c)     The Additional Coverages, too, are tied to loss at an Insured Location and not to a particular Zone of such location;

(d)     Most of the Time Element Extensions and Additional Coverages have their own sublimits, and it would be inconsistent to apply two sets of sublimits to a single loss; and

(e)     At a minimum, the Policy is ambiguous as to whether the Time Element Coverage Extensions and Additional Coverages are subject to the $10,000,000 sublimits, and this ambiguity must be construed against Defendant Insurance Companies as drafters of the Policy.

96.     Third, Defendant Insurance Companies contend that Penford is not entitled to order its claim so as to maximize its recovery. Defendant Insurance Companies are wrong for at least four reasons:

(a)    Established law permits policyholders to order or access multiple limits so as to maximize their insurance;

(b)    It would contradict the commercial purpose of the Policy to limit Penford's recovery because it purchased additional coverages for additional premium;

(c)    Defendant Insurance Companies elected not to include in the Policy language, which is in commercial use, governing application of overlapping coverage; and

(d)    At a minimum, the Policy is ambiguous as to whether Penford is entitled to order its claim so as to maximize recovery, and this ambiguity must be construed against Defendant Insurance Companies as drafters of the Policy.

## COUNT ONE:  DECLARATORY JUDGMENT

97.    Penford hereby repeats and realleges each of the allegations contained in the preceding paragraphs as if the same was set forth herein.

98.    Penford has an actual and present controversy with Defendant Insurance Companies regarding the amount of insurance coverage available to pay their claim of loss and damage form the June 2008 Flood.  It is therefore appropriate for this Court to declare the rights of the parties pursuant to 28 U.S.C. § 2201.

99.    This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment.

100.    Penford is entitled to have the Policy interpreted in a reasonable manner that maximizes its insurance coverage.

101.    Under the circumstances, it is necessary and appropriate for the Court to declare Penford's rights and Defendant Insurance Companies' obligations under the Policy.  Declaratory relief from this Court will resolve outstanding issues between Penford and Defendant Insurance Companies regarding Penford's rights under the Policy.

WHEREFORE, Penford respectfully requests this Court to declare the rights and

obligations of the parties, including but not limited to a declaration that Penford is entitled to the full benefits of the Policy, including ordering and decreeing that Defendant Insurance Companies are required to pay Penford its costs, expenses, attorneys' and other professional fees incurred to obtain the declaration of coverage and any other monetary, equitable, or declaratory relief that is just and proper.

## COUNT TWO:  BREACH OF CONTRACT

102.    Penford hereby repeats and realleges each of the allegations contained in the preceding paragraphs as if the same was set forth herein.

103.    In return for premiums paid, Defendant Insurance Companies agreed to pay for all losses covered under the Policy.

104.    The loss to Penford's real and personal property at the Cedar Rapids Plant in Zones A, B, and C is a covered loss under the Policy.

105.    Penford also has loss covered by Time Element Coverage, Time Element Coverage Extensions, and Additional Coverages of the Policy.

106.    Penford provided timely notice of its claim to Defendant Insurance Companies.

107.    Defendant Insurance Companies were obligated to adjust the total loss and pay Penford for the total loss, subject to the applicable deductibles.

108.    Defendant Insurance Companies breached their obligations under the Policy by:

(a)     failing timely to adjust the loss;

(b)     failing timely to pay undisputed amounts; and

(c)     failing to pay Penford the total amount of its loss.

109.    As a direct and proximate result of Defendant Insurance Companies' breach of contract, Penford has been deprived of the benefits of insurance coverage which Penford had

expected to receive, and for which Penford paid substantial premiums.

110.    As a direct and proximate result of Defendant Insurance Companies' breach of contract, Penford has also incurred additional consequential damages, including without limitation, financing costs, attorneys' fees and other expenses in bringing this action, which damages are not subject to the Policy's limits of liability.

111.    Given the nature of the coverage of the Policy, Defendant Insurance Companies were aware that a failure timely to pay a claim under the Policy would cause consequential damages and losses to Penford.

WHEREFORE, Penford respectfully requests this Court to award Penford all amounts due under the Policy, and other compensatory and consequential damages, interest, attorneys' fees, costs, and any other further relief this Court deems equitable, just, and proper.

## COUNT THREE:  BAD FAITH

112.    Penford hereby repeats and realleges each of the allegations contained in the preceding paragraphs as if the same was set forth herein.

113.    Iowa law recognizes a common law cause of action against an insurance company for bad faith denial or delay of insurance benefits.

114.    Defendant Insurance Companies' conduct in adjusting and refusing to pay fully Penford's insurance claim under the Policy constitutes bad faith as that term is used under Iowa law because Defendant Insurance Companies had no reasonable basis upon which to deny Penford all benefits covered under the Policy and knew, or should have known, that denying such benefits was without reasonable basis.

115.    Defendant Insurance Companies have also acted in bad faith by, among other things,

(a)     unreasonably delaying undisputed payments under the Policy for covered elements of loss;

(b)     disregarding Penford's legal and contractual interests and rights so as to advance Defendant Insurance Companies' interests;

(c)     failing to evaluate Penford's claim in a fair, impartial and objective manner;

(d)     delaying payment of Penford's claim;

(e)     failing to pay undisputed amounts covered under the Policy and recommended by its adjuster; and

(f)     in such other ways as may become evident through discovery in this action.

116.    As a result of Defendant Insurance Companies' bad faith conduct, Penford has been damaged and is entitled to an award of damages, in an amount to be determined after trial, for each category of damages provided under Iowa law.

### JURY DEMAND

117.    Penford hereby demands a trial by jury for all issues so triable that are raised in this Complaint.

WHEREFORE, Penford respectfully requests this Court to award Penford (1) a declaration pursuant to 28 U.S.C. § 2201 that Defendant Insurance Companies are obligated to pay Penford benefits owed under the Policy; (2) an award against Defendant Insurance Companies of compensatory, direct and consequential damages in the amount established by the evidence, which exceeds the jurisdictional minimum of this Court; (3) costs of suit, reasonable attorneys' fees, pre-judgment and post-judgment interest; (4) punitive damages; and (5) any further relief this Court deems equitable, just, and proper.

Dated: January 23, 2009

Respectfully submitted,

ROGER W. STONE, AT0007519
*Simmons Perrine PLC*
115 Third Street SE. Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917

rstone@simmonsperrine.com


*Counsel for Penford Corporation and*
*Penford Products Co.*