**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

PENFORD CORPORATION and
PENFORD PRODUCTS CO.,

        Plaintiff,

vs.

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA and ACE
AMERICAN INSURANCE COMPANY,

        Defendants.

No. 09-CV-13-LRR

**ORDER**

———————————

### *TABLE OF CONTENTS*

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   **RELEVANT PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . **2**

III.  **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.  **MOTION TO STRIKE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

V.    **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . **4**

VI.  **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **5**

     **A.**   **Parties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

     **B.**   **The Policy** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

         **1.**   **Coverages** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

             **a.**   **"Property Damage" coverage &**
                 **"Additional Coverages"** . . . . . . . . . . . . . . . . . . . . **6**

             **b.**   **"Time Element"** . . . . . . . . . . . . . . . . . . . . . . . **6**

         **2.**   **Flood zones** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

         **3.**   **"Limits"** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

         **4.**   **Sublimits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

     **C.**   **The Great Flood of 2008** . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

     **D.**   **Penford's Claims and Defendants' Payments** . . . . . . . . . . . . . . **9**

**VII. ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

    **A.**     **Summary of the Arguments** . . . . . . . . . . . . . . . . . . . . . . . . **10**
        **1.**     **Defendants' Arguments** . . . . . . . . . . . . . . . . . . . . . . . **10**
        **2.**     **Penford's Arguments** . . . . . . . . . . . . . . . . . . . . . . . . . **11**
    **B.**     **The Merits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
        **1.**     **Ambiguity of the Policy** . . . . . . . . . . . . . . . . . . . . . . **15**
            **a.**     **Scope of "Flood" sublimits is unclear** . . . . . . . . . . **17**
            **b.**     **Other provisions of the Policy** . . . . . . . . . . . . . . **17**
            **c.**     **"Limits" language** . . . . . . . . . . . . . . . . . . . . . **19**
        **2.**     **Impact of Ambiguity** . . . . . . . . . . . . . . . . . . . . . . . . **25**

**VIII. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

## I. INTRODUCTION

The matters before the court are: (1) the "Motion for Partial Summary Judgment" ("Penford Motion") (docket no. 33), filed by Plaintiffs Penford Corporation and Penford Products Co. (collectively, "Penford"); (2) the "Motion for Partial Summary Judgment" ("National Union/Ace American Motion") (docket no. 40), filed by Defendants National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and Ace American Insurance Company ("Ace American") (collectively, "Defendants"); and (3) the "Motion to Strike Paragraphs 9, 13-14 and 24-25 of the Affidavits of Timothy Scott and Justin Weltscheff" ("Motion to Strike") (docket no. 55), filed by Penford. The court collectively refers to the Penford Motion and the National Union/Ace American Motion as the "Motions."

## II. RELEVANT PROCEDURAL BACKGROUND

On January 23, 2009, Penford filed a three-count Complaint (docket no. 1) against Defendants. In Count One, Penford seeks a declaratory judgment regarding insurance policies it purchased from Defendants. In Count Two, Penford seeks damages for breach of contract. In Count Three, Penford seeks damages for "bad faith denial or delay of insurance benefits." Complaint at ¶ 13. On March 12, 2009, Defendants filed an Answer (docket no. 22) in which they denied the substance of the Complaint and raised various

affirmative defenses.

On August 28, 2009, Penford filed the Penford Motion. On October 5, 2009, Defendants filed a Resistance to the Penford Motion (docket no. 39). That same date, Defendants filed the National Union/Ace American Motion. On November 9, 2009, Penford filed a Resistance (docket no. 53) to the National Union/Ace American Motion and a Reply (docket no. 54) in support of the Penford Motion. That same date, Penford filed the Motion to Strike.

On November 18, 2009, Defendants filed a Reply (docket no. 58) in support of the National Union/Ace American Motion. On November 25, 2009, Defendants filed a Resistance (docket no. 61) to the Motion to Strike. On December 2, 2009, Penford filed a Reply (docket no. 63) in support of the Motion to Strike.

The parties request oral argument on the Motions. The court finds that oral argument is unnecessary. The Motions are fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

The court has diversity jurisdiction over this case because complete diversity exists among the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States"). National Union and Ace American are citizens of Pennsylvania. Penford Corporation and Penford Products Co. are citizens of Washington and Delaware, respectively. The court is satisfied that subject matter jurisdiction exists.

### IV. MOTION TO STRIKE

In the Motion to Strike, Penford asks the court to strike portions of the Affidavit of Timothy Scott (docket no. 40-4 Ex. B) and the Affidavit of Justin Weltscheff (docket no. 40-4 Ex. C) (together, "Affidavits"), which Defendants submitted in support of the National Union/Ace American Motion. Penford asks the court to strike portions of the

Affidavits on the grounds that they contain speculation and/or because they constitute improper expert testimony.

The court did not consider the portions of the Affidavits at issue in the Motion to Strike in deciding the Motions. Because the court shall deny the Motions, it shall deny the Motion to Strike as moot.

## V. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a plaintiff may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see, e.g.*, *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## VI. RELEVANT FACTUAL BACKGROUND

Viewing the facts in the light most favorable to the non-moving parties and affording them all reasonable inferences, the undisputed facts are as follows:

### A. Parties

Plaintiff Penford Corporation is a Washington corporation with its principal place of business in Centennial, Colorado. Plaintiff Penford Products Co. ("Penford Products") is a Delaware corporation with its principal place of business in Cedar Rapids, Iowa. Penford Products is a wholly-owned subsidiary of Penford Corporation. Penford Products manufactures starch-based products at a plant (the "Plant") in Cedar Rapids, Iowa.

National Union is a Pennsylvania corporation with its principal place of business in New York, New York. Ace American is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

### B. The Policy

Defendants sold Penford two insurance policies[1] with a coverage period of March 1, 2008 through March 1, 2009. The Policy provided $300,000,000 in "all risk" property insurance coverage, subject to various sublimits and deductibles. Plaintiff's Appendix ("Pl. App'x) (docket no. 33-5), at 11. National Union and Ace American each subscribed to 50% of liability.

### 1. Coverages

The general insuring clause of the Policy "insures against all risks of sudden accidental direct physical loss or damage, except as excluded, to property described herein while on 'insured locations' . . . ." *Id.* The Policy insured against loss at many of Penford's locations, including the Plant.

### a. "Property Damage" coverage & "Additional Coverages"

Section B of the Policy, entitled "Property Damage," provided that the Policy insured Penford's real and personal property, subject to certain exclusions. *Id.* at 15. In addition to the "Property Damage" coverage, Section B also included a subsection entitled "Additional Coverages." *Id.* at 16. The "Additional Coverages" provided coverage for numerous types of loss, such as debris removal, decontamination costs, professional fees and, most importantly, flood. With respect to the "Flood" coverage, the Policy provided that it "covers direct physical loss or damage caused by or resulting from Flood." *Id.* at 22.

### b. "Time Element"

Section C of the Policy, entitled "Time Element," provided that "[the Policy] insures TIME ELEMENT loss . . . directly resulting from direct physical loss or damage of the type insured by [the Policy]." *Id.* at 33. Like the "Additional Coverages," the

---

[1] The policies were in all relevant respects identical. As the parties do in their pleadings, the court collectively refers to them as the "Policy."

"Time Element Coverages" provided coverage for many types of loss, such as gross earnings, extra expense, contingent time element, ingress/egress and service interruption time element. *Id.* at 33-41. Generally speaking, the "Time Element Coverages" insured against downstream financial losses that Penford may incur due to physical damage to its property or the property of a third party, such as a supplier or utility provider. For example, if the Plant lost power due to damage at a utility supplier's facility, or Penford was unable to access the Plant for some period, any losses incurred during the shut down would generally be covered under one of the Policy's "Time Element Coverages."

The court hereafter collectively refers to the "Time Element Coverages" and "Additional Coverages" generically as "time element coverages." As the parties do in their pleadings, the court does so with the understanding that such term generally refers to the numerous coverages under the Policy that insure against financial losses resulting from physical loss or damage.

### 2.      *Flood zones*

The Plant is a large facility and encompasses several "flood zones," as defined in Endorsement No. 3 of the Policy. *Id.* at 60. Zone A encompassed all real and personal property that was roughly in the 100-year flood plain. Zone B encompassed all real and personal property that was roughly in the 500-year flood plain. Zone C was not defined in the Policy, but sits at a higher elevation than the remainder of the Plant.

The "Exclusions" section of the Policy generally excluded flood coverage for properties located in Zone A areas. However, the Policy specifically exempted "Cedar Rapids, IA" from this exclusion. *Id.* at 31.

### 3.      *"Limits"*

The "Declarations" section of the Policy contained a subsection entitled "Limits." The "Limits" form the basis of the controversy in the instant action and provide:

> This "policy" also contains Sublimits as specified under this
> clause and the various extensions, endorsements, and Sections

of this "policy." These Sublimits are part of and not in addition to the Limit of Liability. These Sublimits do not increase the Limit of Liability or any other Sublimit. The [insurer] shall not be liable for more than the Sublimit specified for such extensions, endorsement, or Section in any one "occurrence" regardless of the number of "locations" or coverages involved in the "occurrence."

Sublimits stated below apply per "occurrence" for all "locations" and coverages involved.

The maximum Sublimit amount collectible under this "policy" shall be the Sublimit applicable for all loss or damage resulting from a peril insured against by this "policy[,]" regardless of any other Sublimit involved in this "policy[.]"

When the Limit of Liability or a Sublimit is shown as applying in the Aggregate during any "policy" year, the [insurer's] maximum limit of liability will not exceed such limit during any "policy" year regardless of the number of "locations" and coverages involved.

In the event an "occurrence" results in liability payable under more than one policy issued to [Penford] by the [insurer], or its representative companies, the maximum amount payable in the aggregate under all such policies will be the applicable Limit of Liability (or applicable Sublimit) indicated in this "policy" regardless of the number of coverages, "locations" or perils involved.

*Id.* at 11-12.

### *4.* *Sublimits*

Immediately following the "Limits" section, the Policy contained a table entitled "Policy Sublimits." *Id.* at 12-13. The table provided, in relevant part:

| Coverage | Sublimit |
|---|---|
| Flood per occurrence and annual aggregate | $50,000,000 |

| | |
|---|---|
| Flood at Cedar Rapids, IA Facility Zone A per occurrence and annual aggregate | $10,000,000 |
| Flood at Cedar Rapids, IA Facility Zone B per occurrence and annual aggregate | $10,000,000 |
| Civil/Military Authority | 30 Days not to exceed 5 miles |
| Contingent Time Element—For scheduled and unscheduled direct suppliers and recipients only | $10,000,000 |
| Debris Removal | $10,000,000 or 25% whichever is greater |
| Extra Expense | $20,000,000 |
| Ingress/Egress | $1,000,000 |
| Land & Water Contamination or Pollutant Cleanup—Annual Aggregate | $1,000,000 |
| Professional Fees (100% of first $250,000 and then 50% of the amount above $250,000 up to the amount of $1,000,000). | $1,000,000 |
| Service Interruption | $20,000,000 |

*Id.* The Policy did not state a specific sublimit for all coverages. For example, the Policy contained no sublimit for gross earnings.

### C. The Great Flood of 2008

On June 11, 2008, the Cedar River in Cedar Rapids flooded. The Plant is adjacent to the Cedar River. The flood caused substantial damage to the Plant and interrupted Penford's manufacturing operations for some time thereafter.

### D. Penford's Claims and Defendants' Payments

Following the flood, Penford gave Defendants immediate notice of its damage and losses from the flooding. Over the next several months, Penford submitted various letters,

e-mails and documents to Defendants in which Penford estimated its losses and demanded coverage for various losses. Items for which Penford sought coverage included property damage, civil authority coverage, contingent time element coverage, debris removal, decontamination and professional fees. The parties dispute the applicable coverages and sublimits for many of these losses. Penford claims that, so far, its covered losses total approximately $71,000,000. Defendants have only paid Penford $20,455,046. Defendants paid Penford $10,000,000 for loss in Cedar Rapids Zone A, $10,000,000 for loss in Cedar Rapids Zone B and $455,046 for loss in Cedar Rapids Zone C.

## VII. ANALYSIS

In the Motions, the parties ask the court to resolve the following question: "to what losses do the 'Flood' sublimits of the Policy Apply[?]" Penford Motion at 4. Penford argues that the "Flood" sublimits apply only to direct physical loss or damage caused by flood and therefore it is entitled to "access the limits/sublimits for each of the triggered coverages" for its losses other than physical damage. *Id.* at 3. Defendants argue that the "Flood" sublimits apply not only to direct physical loss or damage, but to all of Penford's flood-related losses in Zones A and B.

### A. Summary of the Arguments

#### 1. Defendants' arguments

Defendants argue that the "Flood" sublimits cap Penford's total recovery for flood losses at $10,000,000 for Zone A and $10,000,000 for Zone B. That is, Defendants argue that these sublimits apply to both physical damage and time element losses.

In support of this contention, Defendants rely almost exclusively on the "Limits" section of the Policy. In particular, Defendants argue that the following provision makes clear that the Zones A and B "Flood" sublimits cap all of Penford's flood-related losses:

> The maximum Sublimit amount collectible under this "policy" shall be the Sublimit applicable for *all loss or damage* resulting from *a peril insured against* by this "policy[,]" *regardless of*

10

*any other Sublimit involved in this "policy[.]"*

Pl. App'x at 11 (emphasis added). Defendants argue that the "peril insured against" was flood at Zone A of the Plant and flood at Zone B of the Plant, and therefore the "applicable" sublimits are the "Flood" sublimits for Zones A and B. Accordingly, Defendants contend that these sublimits operate to cap Penford's recovery for all losses resulting from the flood, whether they are physical damage or time element losses. Defendants argue that the Policy does not permit "the cherry picking of flood sublimits for different categories triggered by losses which occur in the same flood zone resulting from the same flood." Def. Resistance at 14.

Defendants further argue that the "Limits" section makes clear that the "Flood" sublimits cap Penford's recovery because the Zones A and B sublimits state that they apply in the "aggregate." *Id.* at 6. Thus, Defendants argue that their "maximum limit of liability during the [p]olicy year cannot exceed the amount of [those sublimits], regardless of the number of coverages involved." Defendants' Brief in Support of National Union/Ace American Motion ("Def. Brief") (docket no. 40-1), at 4. In short, Defendants assert that they "have satisfied their obligation to Penford by paying the full [$10,000,000] sublimits for the flood losses in Zones A and B." Def. Resistance at 8.

### 2. *Penford's arguments*

Penford argues that the "Limits" language relied upon by Defendants does not, by itself, limit Penford's total recovery for flood-related losses to the Zones A and B sublimits. Penford asserts that the language "is premised on the sublimit being 'applicable' in the first place, and directs [the court's] inquiry . . . to the wording of the Flood sublimits and Flood coverage to determine what costs are subject to those sublimits." Plaintiff's Reply in Support of the Penford Motion ("Pl. Reply"), at 3. In other words, Penford argues that the "Limits" language caps its recovery for flood-related losses only if the "Flood" sublimits apply to "all loss or damage" in the first place. Thus, Penford

argues that the court must consider the remainder of the Policy to determine whether the "Flood" sublimits are applicable to all flood-related losses.

Penford argues that its time element losses "are subject to insurance coverages and policy limits/sublimits that are entirely separate and distinct from the [$10,000,000 Zone A and B] sublimits." Plaintiff's Brief in Support of Penford Motion ("Pl. Brief") (docket no. 33-1), at 3. Accordingly, Penford contends that it is "entitled to recover under the individually stated sublimits for those other coverages granted under the [P]olicy and triggered by the losses Penford has incurred, without regard to the payments that Defendants have made that exhaust the [$10,000,000] sublimits for Zones A and B at the [Plant]." *Id.* at 8.

Penford contends that the Policy, construed as a whole, provides that the "Flood" sublimits are confined to physical damage caused by flood. Penford bases this broader claim on three grounds. First, Penford argues that, because the Policy's "Flood" coverage itself is focused solely on property damage, the "Flood" sublimits are likewise confined to physical loss or damage. Second, Penford contends that the time element coverages are intended to cover a different kind of loss—its downstream financial losses. Third, as discussed above, Penford asserts that the Policy's "Limits" section does not operate to "roll up" numerous coverages within the "Flood" sublimits. *Id.* at 13.

Penford submits that, although "predicated on the existence of a physical loss or damage event insurable under [the Policy]," the time element coverages are "separate and distinct from the property damage coverages such as the [f]lood coverage." *Id.* at 7. In support of this interpretation, Penford points out that other Policy provisions relating to flood coverage are focused in terms of physical loss or damage, rather than the "downstream financial losses that result." *Id.* at 11. First, Penford observes that the

Policy defines "Flood" exclusively in terms of physical loss or damage.[2] Second, Penford notes that the Policy defines its "Flood" coverage by stating that "[t]his 'policy' covers *direct physical loss or damage* caused by or resulting from Flood." Pl. App'x at 22 (emphasis added). Third, Penford observes that the Policy provides a loss valuation formula for physical damage based on the cost to repair or replace the property. Penford reasons that, because other Policy provisions relating to "Flood" are cast in terms of physical loss or damage, the "Flood" sublimits must likewise be restricted to physical loss or damage.

In contrast to the Policy's "Flood" coverage, which Penford maintains is focused entirely on physical loss or damage, Penford argues that the time element coverages are focused entirely on the "downstream financial results of property damage." Pl. Brief at 12. First, Penford notes that the time element coverages insure against financial loss resulting from physical damage to Penford's property or the property of a third party. Second, Penford points out that the time element coverages contain their own loss valuation methods, rather than using the Policy's formula for physical damage.[3] Further,

---

[2] The Policy defines "Flood" as:

> Flood; rising waters; surface waters; waves; tide or tidal water; rain accumulation; runoff from natural or man made objects; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; surface waters or sewer back-up resulting from any of the foregoing; regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, direct physical damage by fire, explosion or sprinkler leakage resulting from Flood is not considered to be loss by Flood within the terms and conditions of this "policy[.]" Pl. App'x at 22.

[3] For example, the recoverable "gross earnings loss" is determined by calculating Penford's "gross earnings . . . less all charges and expenses that do not necessarily

(continued…)

Penford notes that "the Policy states separate sublimits for these ancillary coverages . . . ." *Id.* at 13. In sum, Penford argues that, because the time element coverages protect against a different kind of loss than direct physical loss from flood, and because the Policy provides separate sublimits for the time element coverages, "it would violate the plain and ordinary reading of the Policy to subjugate these coverages to the Policy's 'Flood' sublimits." *Id.*

Alternatively, Penford argues that, even if the Zones A and B sublimits apply to more than physical loss and damage, the Zones A and B sublimits do not cap its losses caused by damage to a third party's property[4] or losses that "cannot be attributed solely to operations in a particular zone at [the Plant]." *Id.* at 15. Penford asserts that certain coverages, such as service interruption time element, are triggered by damage at a third party's property and, therefore, cannot be subject to the sublimits for "**Flood at** Cedar Rapids, IA Facility Zone A" or "**Flood at** Cedar Rapids, IA Facility Zone B." *Id.* at 16 (emphases in original). Penford also contends that the Zones A and B sublimits do not apply to losses that are not "exclusively confined" to either Zone A or Zone B. *Id.* at 20.

### B. The Merits

The Policy did not contain a choice of law provision. However, the parties appear to agree that Iowa law controls the dispute because the events and resulting damages occurred in Iowa. The court shall apply Iowa law in the instant analysis.

---

[3] (...continued)
continue during the interruption in production or suspension of business operations or services." Pl. App'x at 27.

[4] Penford argues that such losses include the "service interruption time element," "contingent time element" and "ingress/egress" coverages, which generally insure against Penford's losses that result from damage to a third party's property. For example, if operations at the Plant were temporarily shut down due to damage to a utility provider's property, any losses incurred would fall within the Policy's "service interruption time element" coverage.

The Iowa Supreme Court has summarized the construction and interpretation of insurance policies as follows:

> "Construction of an insurance policy—the process of determining its legal effect—is a question of law for the court. Interpretation—the process of determining the meaning of words used—is also a question of law for the court unless it depends on extrinsic evidence or a choice among reasonable inferences to be drawn." *A.Y. McDonald Indus. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 618 (Iowa 1991). Regarding construction or interpretation questions, the cardinal principle is that the intent of the parties controls. *Id.* Unless the policy is ambiguous, we determine intent by what the policy says. *Id.* We interpret ambiguous policy provisions in favor of the insured because insurance policies are in the nature of adhesion contracts. *Id.* at 619.
>
> In addition, when an insurer has affirmatively expressed coverage through broad promises, it assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms. *Amco Ins. Co. v. Haht*, 490 N.W.2d 843, 845 (Iowa 1992). Also, we interpret a policy from the viewpoint of an ordinary person, not a specialist or expert. *Id.* So when words in a policy are not defined, we will not give such words a technical meaning. *A.Y. McDonald Indus.*, 475 N.W.2d at 619. Rather, we will give undefined words their ordinary meaning, one that a reasonable person would understand them to mean. *Id.*

*Grinnell Mut. Reins. Co. v. Jungling*, 654 N.W.2d 530, 536 (Iowa 2002).

## 1. *Ambiguity of the Policy*

The court first considers whether the Policy is ambiguous. "If the contract is ambiguous and uncertain, extrinsic evidence can be considered to help determine the intent." *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999). If the extrinsic evidence is undisputed, the court must construe the contract. *State Farm Mut. Auto. Ins. Co. v. Townsend*, 361 N.W.2d 332, 335 (Iowa 1984). However, if the evidence is controverted or different inferences may be drawn from the evidence, the construction of

the contract becomes a jury question. *Id.*

Both Penford and Defendants contend that the Policy unambiguously supports their respective positions.[5] "[A] contract is not ambiguous merely because the parties disagree over its meaning." *Hartig Drug Co.*, 602 N.W.2d at 797. Rather, ambiguity exists in an insurance policy only when the policy language is susceptible to two reasonable interpretations. *Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 681 (Iowa 2008); *see also M-Z Enterprises, Inc. v. Hawkeye-Security Ins. Co.*, 318 N.W.2d 408, 413 (Iowa 1982) (stating that "we also have defined 'ambiguous' to mean 'of doubtful nature or meaning,' 'uncertain,' and 'equivocal.'") "In determining whether a policy provision is subject to two equally proper interpretations, [the court] read[s] the insurance contract as an entirety rather than seriatim by clauses." *Thomas*, 749 N.W.2d at 681 (internal quotation marks omitted).

When it applies these principles to the Policy and considers the Policy as a whole, the court finds that the Policy is ambiguous on the issue of what losses are subject to the Zones A and B "Flood" sublimits. First, the "Flood" sublimits themselves do not indicate whether they apply solely to physical damage or to all flood-related losses. Second, other provisions of the Policy do not clearly indicate the intended scope of the "Flood" sublimits. Third, the "Limits" language of the Policy does not clearly and unambiguously

---

[5] Defendants argue that "the interpretation of the Policy does not depend on extrinsic evidence because the words used are clear and unambiguous." Def. Brief at 9. However, Defendants later argue that Penford and/or its insurance broker proposed the language at issue and contend that "the extrinsic evidence supports the conclusion that the parties used clear and unambiguous language to effectuate their intent to provide an annual maximum of $10 million of coverage for losses resulting from flooding in Zones A and B of [the Plant]." *Id.* Penford argues that Defendants' submission of extrinsic evidence is "highly improper" in light of the parties' agreement that the Policy is unambiguous. However, Penford proceeds to argue that Defendants "mischaracterize[] the origin of the Policy" and contend that "the Policy form [was] . . . suggested by [Defendants]." Plaintiff's Resistance ("Pl. Resistance"), at 13.

subject all flood-related losses to the "Flood" sublimits.

### a.     Scope of "Flood" sublimits is unclear

The court begins by noting that the "Flood" sublimits themselves do not provide any indication of, much less define, their scope. That is, the sublimits do not indicate whether they apply to all flood-related losses or solely physical damage caused by flood. The Zones A and B "Flood" sublimits appear, along with 42 other sublimits, in a chart entitled "Policy Sublimits." Pl. App'x at 12. The sublimits chart offers no guidance beyond the title of the sublimits and their respective dollar amounts. Thus, the court concludes that the "Flood" sublimits themselves do not answer the question of what losses are subject to those limits. *Cf. Hewlett-Packard Co. v. Factory Mut. Ins. Co.*, No. 04Civ2791(TPG)(DCF), 2007 WL 983990, at *3 (S.D.N.Y March 30, 2007) (construing policy where certain sublimits stated that they applied to "combined property damage and time element" and concluding that electronic data processing sublimit did not apply to time element loss because the sublimit contained no such inclusive language). Accordingly, the court will turn to other provisions of the Policy to determine if they clarify the scope of the "Flood" sublimits.

### b.     Other provisions of the Policy

Other provisions of the Policy pertaining to the flood and time element coverages do not clarify the intended scope of the "Flood" sublimits. Some provisions support Penford's position, while others support an interpretation of the limits as applicable to all flood-related loss.

As Penford notes, the Policy's grant of "Flood" coverage is cast entirely in terms of physical loss or damage. Specifically, under the heading of "FLOOD," the Policy states that it "covers direct physical loss or damage caused by or resulting from flood." Pl. App'x at 22. The Policy's definition of "Flood" is similarly drafted entirely in terms of physical loss or damage. Penford contends that because the Policy's "Flood" coverage

17

and its definition of "Flood" are defined in terms of physical loss or damage, then the Policy's "Flood" sublimits must similarly be limited to physical loss or damage. This interpretation is supported by the general rule that, absent proof to the contrary, a particular policy term is to be construed uniformly throughout the policy. *See* 37 A.L.R.5th 41 (1996) (citing *Datalab, Inc. v. St. Paul Fire & Marine Ins. Co.*, 347 F.Supp. 36 (S.D.N.Y. 1972)). The term "Flood" is defined only within the Policy's grant of "Flood" coverage, and there is no indication in the Policy that a different meaning was intended when the term "Flood" was used within the Policy sublimits. Thus, the Policy's actual grant of "Flood" coverage and its definition of "Flood" would tend to support a reading of the Policy that limits the "Flood" sublimits to physical loss or damage—rather than encompassing all kinds of flood-related losses.

Other provisions of the Policy, however, support an interpretation of the "Flood" sublimits that would make them applicable to more than physical loss or damage. Most notably, the Policy's grant of "Time Element" coverage provides that the Policy insures time element losses only if such losses "directly result[] from direct physical loss or damage of the type insured by [the Policy]." Pl. App'x at 33. As Defendants assert, this language indicates that "the Policy does not cover time element loss in the abstract[,]" but rather covers only time element losses "resulting from insured perils that damage property." Def. Resistance at 9. As Defendants note, such an interpretation indicates that the time element coverages cannot be detached from the underlying perils, such as flood, that give rise to time element losses. This reading of the time element coverages is consistent with other courts' interpretations of similar coverages and the concept of time element coverages more generally. *See Altru Health Sys. v. Amer. Protection Ins. Co.*, 238 F.3d 961, 964 (8th Cir. 2001) (rejecting contention that civil authority coverage was a "self-contained policy provision" because policy provided coverage for such losses if they resulted "from an interruption of business *as covered hereunder*") (emphasis in

original); *see also Couch on Insurance* (3d Ed. 2009) § 1:61 ("Business interruption" coverage is "[i]ndemnification for loss caused by the interruption of a going business *caused by the destruction of a building, plant, or parts thereof* . . .") (emphasis added).

### c. *"Limits" language*

Defendants argue that the following language unambiguously provides that the "Flood" sublimits for Zones A and B apply to all of Penford's flood-related losses in those zones:

> The maximum Sublimit amount collectible under this "policy" shall be the Sublimit applicable for all loss or damage resulting from a peril insured against by this "policy[,]" regardless of any other Sublimit involved in this "policy[.]"

Pl. App'x at 11. Defendants summarize their interpretation of this language as follows:

> In recognition that more than one sublimit might be triggered in any loss, the Policy expressly states that "the maximum sublimit amount collectible" is the "sublimit applicable for all loss or damage resulting from a peril insured against." Here the peril insured against the peril of flood at Cedar Rapids, IA Facility Zone A and the peril of flood at Cedar Rapids, IA Facility Zone B. The "sublimits[6] applicable for all loss or damage resulting from a peril insured against" are the Cedar Rapids ["Flood"] sublimits.

Def. Brief at 4.

Penford asserts that Defendants misconstrue the language of the "Limits" section. Specifically, Penford argues that the language relied upon by Defendants is actually "premised on the sublimit being 'applicable' in the first place, and directs [the court's] inquiry . . . to the wording of the Flood sublimits and Flood coverage to determine what

---

[6] The court notes that Defendants, while purportedly quoting the Policy language, have added an "s" to "sublimit," which actually appears only in its singular form in the quoted "Limits" language of the Policy. If quoted correctly, this sentence of Defendants' Brief would read: "The '*sublimit* applicable for all loss or damage resulting from a peril insured against' *are* the Cedar Rapids flood *sublimits*." (emphasis added).

costs are subject to those sublimits." Pl. Reply at 3. In other words, Penford contends that the disputed provision actually provides that, *if* there is a sublimit "applicable to all loss or damage" resulting from the peril, *then* that sublimit will be "the maximum sublimit amount collectible . . . ." Thus, Penford argues that, rather than answering the question of what losses are subject to the "Flood" sublimits, the "Limits" language actually requires the court to consider other provisions of the Policy to decide whether the "Flood" sublimits are "applicable to all loss or damage" in the first place.

The "Limits" provision relied upon by Defendants is reasonably susceptible to two interpretations. First, the language could be interpreted to mean that whatever sublimit is the "maximum" amount collectible will be applied to all loss or damage that results from a peril. Second, as Penford contends, the language can reasonably be read to mean that, *if* there is a sublimit that is "applicable to all loss or damage resulting from a peril," *then* that sublimit will be the "maximum amount collectible under [the Policy] . . . ."

The court finds that Defendants' urged interpretation of the "Limits" language simply proceeds under the assumption that the Zones A and B "Flood" sublimits are, in fact, applicable to all loss or damage in order to reach the conclusion that such sublimits are "the maximum sublimit amount collectible." In contrast, under Penford's suggested interpretation, the "Limits" provision could potentially cap Penford's recovery for flood-related losses, but only if the Policy elsewhere indicated that the "Flood" sublimits were to apply to all flood-related loss or damage. As previously discussed, the court finds that the remainder of the Policy fails to provide a clear indication as to the intended scope of the "Flood" sublimits.

The meaning of the "Limits" language, as it applies to the instant action, is further complicated by the fact that the provision refers to "sublimit" entirely in its singular

form.[7] As Penford observes, Defendants thus far have paid on and exhausted at least two sublimits—the Zones A and B "Flood" sublimits, in addition to paying $455,046 for loss in Zone C under the Policy's general $50,000,000 "Flood per occurrence and annual aggregate" sublimit. Penford argues that, "[i]f . . . this 'the maximum Sublimit' language operates to roll up all of Penford's recovery under all of the triggered coverages carrying separate sublimits, then Defendants would have paid Penford only a single sublimit." Pl. Resistance at 6.

The court agrees that Defendants' payment of multiple sublimits for loss in Zone A, Zone B and Zone C appears to be contrary to Defendants' urged interpretation of the "Limits" provision upon which they rely. Defendants' response appears to be that there are multiple "peril[s] insured against" at issue. Specifically, Defendants contend that "the peril insured against" is the peril of flood in Zone A of the Plant and the peril of flood in Zone B of the Plant, and thus the payment of multiple "maximum sublimit[s]" is not at odds with Defendants' reading of the "Limits" provision. Penford asserts that Defendants' position "seek[s] to redefine the peril of '[F]lood' into three separate perils: flood at [Zone A], flood at [Zone B], and flood everywhere else." Pl. Resistance at 6. Penford asks the court to reject Defendants' position because nothing in the Policy language indicates that the "peril" of flood is to be segregated into separate perils based on the location of the flooding.

The Policy does not define the term "peril" and, as Penford notes, "the references to 'Flood at Cedar Rapids, IA Facility Zone A' and 'Flood at Cedar Rapids, IA Facility Zone B' appear in a chart titled 'Policy Sublimits,' not 'Policy Perils.'" *Id.* Because "peril" is not defined in the Policy, the court must give "peril" its ordinary meaning—one

---

[7] "*The maximum Sublimit* amount collectible under this 'policy' shall be *the Sublimit* applicable for all loss or damage resulting from *a peril* insured against by this 'policy[,]' regardless of any other *Sublimit* involved in this 'policy[.]'" Pl. App'x at 11 (emphasis added).

that a reasonable person would understand it to mean. *A.Y. McDonald Indus.*, 475 N.W.2d at 619. The court agrees with Penford that the "ordinary meaning of a 'peril' is a cause of loss, not a cause of loss in a particular location." Pl. Resistance at 7. Applying this definition of "peril" to the "Limits" provision, the court finds that Defendants' payment of multiple sublimits is, to some degree, inconsistent with its urged reading of Policy language that refers entirely to a singular sublimit.

The Policy's ambiguity with regard to the intended scope of the "Flood" sublimits becomes more apparent when one considers the language confronted by other courts facing similar issues. Defendants argue that the "Limits" language and the Policy language as a whole is similar to that considered by the Eighth Circuit Court of Appeals in *Altru Health Sys. v. Am. Prot. Ins. Co.*, 238 F.3d 961 (8th Cir. 2001). In *Altru*, the insured operated a hospital. *Id.* at 962. During a flood, waters reached the hospital parking lot. *Id.* The state health department ordered the hospital to evacuate its patients and the hospital remained closed for three weeks. *Id.* The insured submitted a claim to its insurer for over $5,000,000 in property damage to the parking lot, business interruption losses and evacuation expenses. *Id.* However, the insurer argued that its liability was limited by the policy's $1,500,000 flood sublimit. *Id.*

The Eighth Circuit Court of Appeals, applying North Dakota law, agreed with the insurer and concluded that the policy's flood sublimit capped the insurer's liability for all of the claimed loss, including business interruption and extra expense. *Id.* at 965. In doing so, the Eighth Circuit Court of Appeals took note of several pertinent policy provisions. First, the policy "Preamble" provided that "[a]ll liability for loss or expense under this Policy for any one occurrence shall not exceed the smallest of . . . any applicable sublimits . . . ." *Id.* at 964. Second, the "Flood Coverage Section" provided that "all claims for loss, damage or expense arising out of any one Flood occurrence shall be adjusted as one claim." *Id.* Thus, the policy in *Altru* explicitly stated that the insurer's

liability for one occurrence was capped at the "smallest of . . . any applicable sublimits" and also required that "all claims for loss, damage or expense" from a single flood be "adjusted as one claim." *Id.* The Eighth Circuit Court of Appeals concluded that these provisions, considered together, "clearly and unambiguously limited coverage for all claims arising out of [the flood], including [the insured's] claims for business interruption and extra expense losses, to [the] $1,500,000 [flood sublimit]." *Id.* at 965.[8]

The court disagrees with Defendants that the Policy provisions in this case are "substantively the same as those at issue in *Altru*." Def. Resistance at 7. As discussed above, the "Limits" language relied upon by Defendants is reasonably susceptible to at least two interpretations. However, neither interpretation unambiguously requires that the "Flood" sublimits operate as a cap on all kinds of flood-related loss. Most notably, the Policy does not include language similar to the Preamble in *Altru*, which explicitly provided that "[a]ll liability for loss or expense under this Policy *for any one occurrence shall not exceed the smallest of . . . any applicable sublimits . . . .*" *Altru Health Sys.*, 238 F.3d at 964 (emphasis added). Further, the court in *Altru* relied upon the language

---

[8] Several other decisions that reach conclusions similar to that urged by Defendants involved explicit language that subjected all kinds of loss to certain sublimits. *See, e.g.*, *For Kids Only Child Dev. Ctr, Inc. v. Phila. Indem. Ins. Co.*, 260 S.W.3d 652, 656 (Tex. App. 2008) (holding that insured could not recover additional damages for loss of income, extra expenses and debris removal resulting from a sewer backup where policy provided: "We will pay for *the loss or damage* caused by or resulting from flood damage or water that backs up from a sewer, drain or sump. We will pay *not more than $25,000 in any one occurrence*.") (emphasis added); *Strowig Prop., Inc. v. Am. States Ins. Co.*, 80 P.3d 72, 73-75 (Kan. Ct. App. 2003) (concluding that debris removal coverage was not in addition to payments for direct physical loss or damage where policy provided that "[t]he most we will pay for *loss or damage in any one occurrence* is the applicable Limit of Insurance" and provided that payments under the debris removal coverage "*will not increase the applicable Limit of Insurance*[.]") (emphasis added); *Cf. Hewlett Packard Co.*, 2007 WL 983990, at *3 (policy stated that certain sublimits applied to "combined property damage and time element").

of the "Flood Coverage Section," which provided that "all claims for loss, damage or expense arising out of any one Flood occurrence shall be adjusted as one claim." *Id.* In contrast, the Policy in the instant action does not expressly provide that all loss (physical or otherwise) from flood is to be considered as a single claim.

Penford argues that the instant dispute is analogous to the Eighth Circuit Court of Appeals' decision in *Mark Andy, Inc. v. Hartford Fire Ins. Co.*, 233 F.3d 1090 (8th Cir. 2001), *modifying* 229 F.3d 710 (8th Cir. 2000). In *Mark Andy*, the insured's manufacturing facility incurred substantial flood damage that also interrupted its business. *Id.* at 1092. A "Flood Endorsement" within the policy added flood coverage with a $5,000,000 sublimit for the facility in question. *Id.* The policy also covered business interruption losses "resulting directly from necessary interruption of business caused by physical loss or damage of the type insured against . . . ." *Id.* There was no sublimit for business interruption losses. *Id.* The insured claimed $25,000,000 in losses. *Id.* However, the insurer argued that its obligations were capped at the policy's $5,000,000 flood sublimit. *Id.* The insured contended that the sublimit in the "Flood Endorsement" applied only to direct property damage and that its business interruption losses were subject to the policy's blanket "All Other Perils" limit of $38,500,000. *Id.* The insurer, like Defendants here, argued that the $5,000,000 flood sublimit "applied to business-interruption loss caused by a flood as well as to direct property damage." *Id.*

The Eighth Circuit Court of Appeals agreed with the insured and held that the insured's business interruption losses were not subject to the $5,000,000 flood sublimit. *Id* at 1093. In so holding, the Eighth Circuit Court of Appeals noted that the policy did not include a specific sublimit for the business interruption coverage and that the "Flood Endorsement," which contained the $5,000,000 flood sublimit, did not specifically mention business interruption losses, while another endorsement "specifically stated that it did not insure against loss resulting from the interruption of business." *Id.* at 1092. The Eighth

Circuit Court of Appeals stated that, "[a]t best, the insurance policy is ambiguous on the issue of business-interruption losses caused by a flood . . . ." *Id.*

Like the policy in *Mark Andy*, the Policy in the instant action contains no sublimit for certain coverages, such as gross earnings losses. The "Flood" sublimits in the Policy also do not specifically state whether they apply to time element loss as well as property damage. Defendants attempt to distinguish *Mark Andy* on the basis that the policy in that case did not contain language similar to the "Limits" provision.

The court finds that the Policy lies somewhere between that considered in *Altru* and *Mark Andy*. The Policy does not, as in *Altru*, clearly subject all loss from flood to a single sublimit. However, the policy in *Mark Andy* did not contain language like that of the "Limits" provision in the instant action. The "Limits" language could, depending on the parties' intent, cap Penford's recovery at the "Flood" sublimits. However, that would only be the case if the parties intended the "Flood" sublimits to apply to all flood-related losses in the first place. Accordingly, the Policy is ambiguous on the question raised in the Motions.

### 2. *Impact of ambiguity*

The court notes that the parties proceeded with the Motions largely based on their contentions that the Policy unambiguously supported their respective positions. As a consequence, the Motions were filed months before discovery closed on January 1, 2010 and the parties submitted only limited extrinsic evidence in support of the Motions. However, the court finds that the Policy is ambiguous on the question of what losses are subject to the Policy's "Flood" sublimits. The court also finds that the ambiguity is not resolved by the language of the Policy itself and the application of appropriate rules of construction. Thus, extrinsic evidence is admissible to determine the parties' intent with regard to the scope of the "Flood" sublimits. *Hartig Drug Co.*, 602 N.W.2d at 797. The parties dispute the extrinsic evidence relevant to the question of whether they intended the

"Flood" sublimits to apply to all flood-related losses. Therefore, the interpretation of the Policy in light of extrinsic evidence is a question of fact reserved for a jury. *Grinnell Mut. Reins. Co.*, 654 N.W.2d at 536. Accordingly, the court shall deny the Motions.

## VIII. CONCLUSION

In light of the foregoing, it is **HEREBY ORDERED THAT**:

(1)     The Motion to Strike (docket no. 55) is **DENIED AS MOOT**;

(2)     The Penford Motion (docket no. 33) is **DENIED**; and

(3)     The National Union/Ace American Motion (docket no. 40) is **DENIED**.

**DATED** this 19th day of January, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA