**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| PENFORD CORPORATION and PENFORD PRODUCTS CO., | | |
| Plaintiffs, | | No. 09-CV-13-LRR |
| vs. | | **ORDER** |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA and ACE AMERICAN INSURANCE COMPANY, | | |
| Defendants. | | |

_____

### *TABLE OF CONTENTS*

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   **RELEVANT PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . **2**

III.  **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    A.  *Defendants' Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        1.  *"Expert" opinions not previously disclosed* . . . . . . . . . . . . **3**
        2.  *Jolstad's expert opinions* . . . . . . . . . . . . . . . . . . . . **4**
            a.  *Legal background* . . . . . . . . . . . . . . . . . . . . . **4**
            b.  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . **6**
                i.   *Bad faith* . . . . . . . . . . . . . . . . . . . . . . **6**
                ii.  *Quantifying damages* . . . . . . . . . . . . . . . . . **7**
                iii. *Topics in Jolstad's supplemental report* . . . . . . **8**
        3.  *Extrinsic evidence from Penford's employees* . . . . . . . . . . . **9**
        4.  *Evidence of service interruption time element loss* . . . . . . . . **10**
        5.  *Evidence of credit facility amendment fees and costs* . . . . . . **10**
        6.  *Reference to AIG or any AIG entity other than National Union and AIG Global Marine* . . . . . . . . . . . . . . . . . . . **11**
        7.  *Evidence of other bad faith lawsuits* . . . . . . . . . . . . . . . **12**
        8.  *Evidence of Defendants' net worth* . . . . . . . . . . . . . . . . **12**
    B.  *Penford's Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

1.   ***Extrinsic evidence of parties' intent with respect to
     meaning of policy language*** . . . . . . . . . . . . . . . . . . . . . . **12**
     a.    ***Rehmer's testimony*** . . . . . . . . . . . . . . . . . . . . . . **13**
     b.    ***Defendants' underwriting guidelines*** . . . . . . . . . . . . **15**
2.   ***Testimony of Peter Evans*** . . . . . . . . . . . . . . . . . . . . . . **16**
     a.    ***Meaning of policy language*** . . . . . . . . . . . . . . . . . . **16**
     b.    ***Bad faith opinions*** . . . . . . . . . . . . . . . . . . . . . . . . **16**
3.   ***Michael Webster's expert opinions*** . . . . . . . . . . . . . . . . . . **18**

**IV.   CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

## I.  INTRODUCTION

The matters before the court are: (1) the Motion in Limine ("Defendants' Motion") (docket no. 74) filed by Defendants National Union Fire Insurance Company of Pittsburgh, PA and Ace American Insurance Company; and (2) the Motion in Limine ("Penford's Motion") (docket no. 75) filed by Plaintiffs Penford Corporation and Penford Products Co (collectively, "Penford").[1]

## II.  RELEVANT PROCEDURAL BACKGROUND

On May 6, 2010, the parties filed the Motions.  On May 13, 2010, Penford filed a Resistance ("Penford's Resistance") (docket no. 78) to Defendants' Motion and Defendants filed a Resistance ("Defendants' Resistance") (docket no. 79) to Penford's Motion.  On May 20, 2010, the court held a Final Pretrial Conference ("Hearing").  At the Hearing, the court heard oral argument on the Motions.  The court reserved ruling on the Motions pending the instant Order.

## III.  ANALYSIS

First, the court considers Defendants' Motion.  Then, the court shall consider Penford's Motion.

---

[1] The court refers to Defendants' Motion and Penford's Motion together as "the Motions."

### A. Defendant's Motion

#### 1. "Expert" opinions not previously disclosed

Defendants ask the court to bar Penford from "soliciting any expert opinion from any witness other than [Olie] Jolstad" on the ground that Penford has not disclosed any expert opinion regarding its business interruption losses. Defendants' Motion at 2. Penford intends to introduce evidence of its business interruption losses through the testimony of Ed McKenna, an accountant with Marsh Forensic Account and Claims Services, who prepared Penford's insurance claim submissions. Penford also intends to introduce the claim submissions. Additionally, Penford may call Mark Wynne, Penford's North American controller, to testify on the same issue. Wynne was involved in providing information to McKenna for the claim submissions.

As stated at the Hearing, Defendants' Motion is **DENIED** to the extent it seeks to bar the testimony of these witnesses on business interruption losses. McKenna prepared Penford's business interruption claim. Therefore, he may testify as a percipient fact witness regarding the information contained in Penford's claim submissions and need not be designated as an "expert" to do so. *See US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009) (stating that a witness "may provide lay opinion testimony about facts within his or her range of generalized knowledge" and that "[p]erceptions based on industry experience [are] a sufficient foundation for lay opinion testimony") (citations and internal quotation marks omitted); *see also Teen-Ed, Inc. v. Kimball Int'l., Inc.*, 620 F.2d 399, 403 (3d Cir. 1980) ("The fact that [the witness] might have been able to qualify as an expert witness on the use of accepted accounting principles in the calculation of business losses should not have prevented his testifying on the basis of his knowledge of appellant's records about how lost profits could be calculated from the data contained therein.").

Similarly, as one of the Penford agents who provided information to McKenna to assist in the preparation of the claim submissions, Wynne may also testify regarding

Penford's business interruption losses. *See Allied Sys., Ltd. v. Teamsters*, 304 F.3d 785, 792 (8th Cir. 2002) ("The opinion testimony of an officer of a business as to value or projected profits or as to damage to the business, without qualifying the officer as an expert, 'is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.'") (quoting Fed. R. Evid. 701, advisory committee's note (2000)); *see also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (holding that plaintiff's owner could testify regarding lost profits without qualifying as an expert because testimony was based on his personal knowledge and familiarity with the business). Accordingly, Penford may call McKenna and/or Wynne to testify regarding Penford's business interruption losses.

### 2. *Jolstad's expert opinions*

Defendants ask the court to bar Jolstad from testifying regarding Defendants' alleged bad faith. Defendants argue that the court's Order (docket no. 64) denying the parties' cross-motions for summary judgment precludes this testimony. Defendants also argue that Jolstad should be barred from testifying as to the timeliness of Defendants' payments and as to the "topics" listed in his supplemental report. As stated at the Hearing, Defendants' Motion is **DENIED** to the extent it seeks to completely bar Jolstad's expert opinions. However, as explained below, the court reserves ruling on the admissibility of certain aspects of Jolstad's testimony.

### a. *Legal background*

Federal Rule of Evidence 702 governs the use of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the

testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "Rule 702 was amended in 2000 in response to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (citing Fed. R. Evid. 702 advisory committee's note). "*Daubert* charged trial judges with acting as gatekeepers to exclude unreliable expert testimony." *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). Under Rule 702 and *Daubert*, district courts now have "the discretion necessary to close the courtroom door to 'junk science' and to admit reliable expert testimony that will aid the trier of fact." *Id.* (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). In other words, "[d]istrict courts have wide latitude in determining whether an expert's testimony is reliable." *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007).

"The proponent of an expert witness bears the burden of establishing that his or her testimony is admissible by a preponderance of the evidence." *Probatter Sports, LLC v. Joyner Tech., Inc.*, No. 05-CV-2045-LRR, 2007 WL 3285799, at *4 (N.D. Iowa Oct. 18, 2007) (Reade, C.J.) (citing Fed. R. Evid. 702 advisory committee notes). "[A]ny doubts regarding the admissibility of the expert testimony should be resolved in favor of admission." *Id.* (citing *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006)). "'[T]he rejection of expert testimony is the exception rather than the rule.'" *Robinson*, 447 F.3d at 1100 (quoting Fed. R. Evid. 702 advisory committee's note). "'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 595).

### b.    Analysis

#### i.    Bad faith

The court finds that its previous rulings do not preclude Jolstad's testimony on the issue of bad faith.  Penford contends not only that Defendants acted in bad faith with regard to coverage, but also with respect to the timing of Defendants' payments on amounts undisputedly due under the policy.  In its previous ruling, the court held that the policy language was ambiguous.  Defendants argue that this ruling somehow moots Penford's bad faith claim, because Defendants' refusal to pay in light of the ambiguous policy could not be in bad faith.  The court disagrees.  "'To establish a first-party bad-faith claim, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.'"  *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 51 (Iowa 2003) (quoting *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 396 (Iowa 2001)) (internal quotation marks and emphasis omitted).  Defendants have not cited any authority suggesting that the existence of ambiguous policy language is a reasonable basis to deny a claim and precludes Penford from asserting a bad faith claim.

In any event, as the court noted above, Penford also alleges that Defendants acted with bad faith in delaying payment of certain sums that Penford was undisputedly entitled to under the policy.  Thus, Jolstad's opinions are probative on the issue of whether Defendants acted in bad faith in handling Penford's claims.  *See* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").  Accordingly, the court finds that its previous rulings do not bar Jolstad's opinion testimony on the issue of bad faith.

Defendants also ask the court to bar Jolstad's opinions regarding the timeliness of Defendants' payments to Penford.  First, Defendants claim that Jolstad's opinion on this

issue is based on nothing more than his "fertile imagination" and has "no basis in either the policy or the Iowa statutes." Defendants' Motion at 8. Second, Defendants argue that his opinions on this issue are irrelevant because Penford cannot quantify any damages as a result of any delay in payment.

The court disagrees with Defendants claim that Jolstad's opinion must be barred because it allegedly has no basis in the policy or Iowa statutes. *Id.* at 8. Under Iowa law, a plaintiff may prevail on a bad faith claim if he or she can show that "the insurer 'lacked a reasonable basis for denying or delaying payment of the claim.'" *Schuller v. Great-West Life & Annuity Ins. Co.*, No. C-04-62-LRR, 2005 WL 2259993, at *14 (N.D. Iowa Sept. 15, 2005) (Reade, C.J.) (quoting *Galbraith v. Allied Mut. Ins. Co.*, 698 N.W.2d 325, 328 (Iowa 2005)). Jolstad's opinions are based on his extensive experience in the insurance industry, and his testimony as to whether Defendants conduct constituted bad faith—when judged against the customs, practices and standards of the insurance industry—will be helpful to the jury in assessing Penford's bad faith claim. Defendants can appropriately test Jolstad's opinions, and the basis for them, on cross-examination and through the presentation of contrary evidence, including their own bad faith expert, Peter Evans.

### ii.    *Quantifying damages*

The court also rejects Defendants' claim that Jolstad's opinions are irrelevant because Penford cannot quantify any damages as a result of the allegedly late payments. As discussed in Section III.A.5, *infra*, Penford seeks to recover, as consequential damages, credit facility amendment expenses. Penford claims that it incurred these fees as a result of Defendants' alleged bad faith delay of payments. Accordingly, Jolstad's opinion regarding the timeliness of Defendants' payments is directly relevant to such damages. Fed. R. Evid. 401. Therefore, the court will not bar Jolstad's testimony regarding the timeliness of payments.

### iii.     Topics in Jolstad's supplemental report

Defendants also argue that Jolstad should be barred from testifying as to any of the "topics" listed in his supplemental report because these "topics" do not constitute opinions. For example, in his supplemental report, Jolstad states that "it may be necessary for [him] to express opinions regarding . . . general topics" such as "[t]he history and development of commercial property insurance" and the "general purpose and use of commercial property polices, their structure, and how one should read a policy in order to determine coverage." Defendants' Exhibit 6 (docket no. 74-7), at 2-3.

An expert report must include "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i); *See also Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008) ("When a party fails to provide information or identify a witness in compliance with Rule 26(a) . . ., the district court has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case."). The court agrees that many of the items listed as "Supplemental Opinions" in Jolstad's supplemental report are more accurately described as "topics" rather than actual opinions.[2]

Penford contends that Defendants had an opportunity to depose Jolstad on these topics. In any event, Penford indicates only that these topics "might be mentioned" in

---

[2] The court also notes that courts frequently limit expert opinions to those that were disclosed in the expert's report. *See Marine Polymer Tech., Inc. v. HemCon, Inc.*, No. 06-CV-100-JD, 2010 WL 1427549 (D.N.H. April 2, 2010) (noting that Rule 26 does not limit an expert to merely "reading his report" but holding that expert's testimony at trial "is limited to the opinions and bases for those opinions that were disclosed in his 2007 report"); *Access for the Disabled, Inc. v. T.S. Margate Co., Ltd.*, No. 08-60483-CIV, 2008 WL 2761284, at *1 (S.D. Fla. July 15, 2008) (limiting expert's testimony to "those opinions previously disclosed" in his expert report because "a party is prohibited from introducing at trial . . . expert opinions not contained in an expert report and properly disclosed") (citing Fed. R. Civ. P. 37(c)(1)).

Jolstad's testimony. Penford's Resistance at 10. Because it is unclear whether Penford intends for Jolstad to testify regarding the topics at issue, or whether any such testimony would constitute opinion testimony or merely provide context for Jolstad's testimony, the court **RESERVES RULING** on this issue. However, Penford is cautioned that Jolstad's opinion testimony shall be limited to only those opinions which were disclosed to Defendants in an expert report.

### 3. *Extrinsic evidence from Penford's employees*

Defendants ask the court to "bar any Penford employee from offering testimony regarding evidence about the intent of the parties and the application of the [policy's flood] sublimits." Defendants' Motion at 15. Defendants contend that, because no Penford employee was allegedly involved in the negotiations or the wording of the policy, "[n]o Penford employee has any relevant testimony to offer as to the parties' intent at the time the policy was issued."[3] *Id.*

Penford agrees with Defendants that "'only the intent of the parties at the time they executed the policy is relevant.'" Penford Resistance at 11 (quoting Defendants' Motion at 12). Penford also does not dispute Defendants' claim that no Penford employee can offer testimony relevant to the application of the policy's flood sublimits or the parties'

---

[3] At his deposition, Penford's CFO, Steve Cordier, testified as follows:

> Q.    Did you have any involvement in reviewing policy language or approving the policy form that Marsh would send as part of its submission package?
>
> A.    No.
>
> Q.    Did anybody at Penford, to your knowledge?
>
> A.    No.

Defendant's Exhibit 8 (docket no. 74-9), at 9-10. He also testified that, to his knowledge, "no Penford employee was involved with the exchanges of communications between Marsh and the insurance companies with regard to the topic of sublimits." *Id.* at 6.

intent prior to the policy's issuance. A Penford employee that was in no way involved in obtaining the policy from Defendants, discussing the proposed policy with Defendants or negotiating the language therein could not offer relevant testimony as to the parties' intent at the time the policy was executed. Such testimony would not be probative of the parties' intent and is therefore inadmissible. Fed. R. Evid. 401-402. Accordingly, Defendants' Motion is **GRANTED** to the extent it seeks to bar Penford employees from testifying regarding the intent of the parties and the application of the policy's flood sublimits.

### 4. *Evidence of service interruption time element loss*

As discussed at the Hearing, Penford will not pursue a claim for service interruption losses at trial. Accordingly, Defendants' Motion is **GRANTED** to the extent to seeks to bar Penford from presenting evidence of service interruption time element losses. However, to the extent necessary to provide context and factual background, the court will allow Penford to refer to the events at its facility during and after the flooding, including service interruption issues (e.g., that water or gas service was turned off).

### 5. *Evidence of credit facility amendment fees and costs*

Defendants ask the court to bar evidence on or reference to approximately $3.255 million in credit facility amendment expenses that Penford incurred and claims as damages. Defendants argue that Penford has "unequivocally claimed" this amount as an "Extra Expense" under the policy. Defendants' Motion at 23. Defendants' maintain that the policy does not cover these expenses because they occurred outside the period of liability. In its Resistance and at the Hearing, Penford indicated that it seeks to recover these costs either as an "extra expense" under the policy or as consequential damages on its bad faith claim.

As stated at the Hearing, this portion of Defendants' Motion is **DENIED**. Such evidence is relevant to Penford's damages and Defendants will not be prejudiced by its admission. Defendants do not argue that they were unaware that Penford intended to claim

this amount as damages and do not dispute that discovery was conducted on this issue. Rather, Defendants take issue only with Penford's intention to seek this amount under alternative legal theories. Defendants are free to argue at trial that Penford is not entitled to recover these amounts under either theory.

### 6.    *Reference to AIG or any AIG entity other than National Union and AIG Global Marine*

As discussed at the Hearing, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART** to the extent it seeks to bar Penford's counsel and witnesses from introducing evidence on, commenting upon, mentioning or referring to:

> (1) AIG or any AIG entity other than National Union or AIG Global Marine and Energy;
>
> (2) Financial issues, involving AIG, including "government bailouts," TARP monies, etc.; and
>
> (3) Any adverse publicity as respects AIG.

Defendants' Motion at 24. At the Hearing, Penford indicated that it has no intention of referring to publicity regarding AIG, TARP monies, government bailouts, and related issues as they pertain to AIG or otherwise. Accordingly, Defendants' Motion is **GRANTED** with respect to those issues and Penford shall not introduce evidence on or refer to these matters at trial.

Defendants' Motion is **DENIED** insofar as it seeks to bar all references to AIG and other AIG-related entities. As discussed at the Hearing, reference to these entities will likely be unavoidable due to AIG's relationship with National Union. In light of this relationship, such evidence is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 401 & 403. It would be cumbersome and impractical to avoid all reference at trial to AIG and/or remove reference to AIG from all trial exhibits. However, Penford is cautioned to avoid needless and/or excessive references at trial to AIG or any matters outside the record.

### 7. *Evidence of other bad faith lawsuits*

As discussed at the Hearing, Defendants' Motion is **GRANTED** to the extent it asks the court to bar evidence of "other bad faith claims and lawsuits asserted against Defendants." Defendants' Motion at 29. Penford indicates that it does not intend to use such evidence in its case-in-chief. However, as discussed at the Hearing, Penford may seek to use such evidence for cross-examination and rebuttal purposes should Defendants open the door by presenting evidence on this issue (e.g., that they always act in good faith when addressing coverage questions). The court advises Penford to request a sidebar prior to introducing this evidence at trial.

### 8. *Evidence of Defendants' net worth*

Defendants ask the court to bar evidence of their net worth on the ground that this evidence is "inadmissible on the issue of punitive damages until such time as the plaintiff has established a prima facie case for punitive damages." Defendants' Motion at 29. As discussed at the hearing, this portion of Defendants' Motion is **GRANTED**. The court will not admit evidence of Defendants' financial condition unless and until the jury reaches a verdict that would support an award of punitive damages. In the event of such a verdict, the court will permit the parties to present further evidence and argument on the issue of punitive damages.

## B. *Penford's Motion*

### 1. *Extrinsic evidence of parties' intent with respect to meaning of policy language*

Penford asks the court to bar certain extrinsic evidence regarding the parties' mutual understanding with respect to the meaning of the "Limits" and "Sublimits" policy language. Penford contends that two categories of evidence should be excluded because it was not expressed between the parties prior to the placement of the policy. First, Penford seeks to bar certain testimony from Marilyn Rehmer, an employee of Penford's insurance broker, Marsh USA, Inc. ("Marsh"). Second, Penford seeks to bar testimony

from Defendants' underwriting personnel regarding Defendants' underwriting guidelines.

When contract language is ambiguous, it is necessary to "search for 'the meanings attached by each party at the time the contract was made.'" *Clinton Phys. Therapy Serv., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 615 (Iowa 2006) (quoting E. Allan Farnsworth, *Contracts* § 7.9, at 458 (3d ed. 1999)). "To reveal this intent, extrinsic evidence is admissible when it sheds light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain." *Id.* (internal quotation marks omitted).

### a.    *Rehmer's testimony*

At her deposition, Rehmer was questioned about an e-mail she had sent to a Penford employee, Margaret Von Der Schmidt, in 2007. In the e-mail, Rehmer stated that "Penford also purchases all risk property insurance which includes coverage for flood in Cedar Rapids, IA for both Flood Zone A for $10,000,000 and in Flood Zone B for $10,000,000." Defendants' Exhibit E (docket no. 79-6), at 39. Shortly before the flood, Rehmer forwarded the e-mail to Penford's controller, Mark Wynne, and stated, in relevant part, that "the only changes are last year the Flood sublimit on the all risk property policies was $5,000,000 and we had that increased this year to $10,000,000." *Id.* At her deposition, Rehmer was questioned regarding this e-mail:

> Q.    When you wrote this, was it your understanding that the two $10 million Cedar Rapids flood sublimits would apply to both property damage and time element loss?
>
> [Penford's Counsel]:   Objection: No foundation, calls for speculation and legal conclusions.
>
> A.    It was my understanding, yes.

Deposition of Marilyn Rehmer ("Rehmer Depo.") (docket no. 75-3), at 15.

Penford contends that Rehmer's testimony as to her "after-the-fact" understanding of the policy's limits and sublimits language is irrelevant because it is not probative of the

parties' "mutual intent at the time of contract formation." Penford's Motion at 4. Penford also argues that Rehmer's testimony is inadmissible due to lack of foundation. Defendants counter that the e-mail, and Rehmer's understanding, constitute "highly relevant extrinsic evidence as to what Marsh intended when it sent the 2008 insurance proposal to [Defendants] in which it requested one $15 million sublimit for flood coverage at Cedar Rapids, and when it ultimately agreed to, through negotiation, two $10 million sublimits without changing the other terms of its own submission which clearly provide that all of the Policy's coverages would be subject to the flood sublimits." Defendants' Resistance at 9-10.

The court finds that it will be in a better position to address Penford's foundation and relevance arguments regarding Rehmer's testimony at trial, when it has the benefit of the context in which the objected to testimony is offered. The court also notes that the parties vigorously dispute whether an agency relationship existed between Penford and Marsh, and therefore whether Rehmer's understanding of the policy should be imputed to Penford. Under Iowa law, "[t]he existence of an agency relationship is ordinarily a fact question, but there must be substantial evidence to generate a jury question." *Smith v. Air Feeds, Inc.*, 519 N.W.2d 827, 831 (Iowa Ct. App. 1994) (citing *Chariton Feed and Grain, Inc. v. Harder*, 369 N.W.2d 777, 779 (Iowa 1985)). Direct evidence is not required to establish an agency relationship. *Id.* (citing *Menzel v. Morse*, 362 N.W.2d 465, 475 (Iowa 1985)). "Agency may be proven by the words and conduct of the parties, together with all the circumstances of the particular case." *Id.* Penford does not dispute that it retained Marsh to obtain the policy or that Rehmer was the Marsh employee primarily responsible for working with Defendants' underwriters to do so. The question of whether an agency relationship existed between Penford and Marsh appears to be a key issue in resolving Penford's objections to Rehmer's testimony. It would not be appropriate to resolve these questions without the benefit of additional evidence regarding Marsh and Penford's

relationship that may adduced at trial. Accordingly, the court **RESERVES RULING** on the admissibility of Rehmer's testimony as to her understanding of the policy.

### b. *Defendants' underwriting guidelines*

For largely the same reasons it challenges Rehmer's testimony, Penford asks the court to bar testimony from Defendants' underwriting representatives that their underwriting guidelines "allegedly precluded them from issuing flood limits in accord with Penford's interpretation of the Policy." Penford's Motion at 8-9. Defendants contend that their underwriting guidelines are "relevant to the antecedent negotiations between Marsh and [Defendants] for changes to the amount of the flood sublimits, the situation in which the parties found themselves during the negotiations, and the mutual goals of Marsh and [Defendants] to give Penford greater flood coverage within [Defendants'] underwriting constraints." Defendants' Resistance at 10. The court agrees with Defendants that this evidence would be probative of the Defendants' situation prior to executing the policy and "the objects they were striving to attain." *Clinton Phys. Therapy Serv.*, 714 N.W.2d at 615. However, Penford insists that, because they were purportedly never discussed or communicated with Penford, the guidelines are irrelevant.

For the reasons discussed above with respect to Rehmer's testimony, the court finds that it will best be able to resolve this issue at trial. From Rehmer's deposition testimony, it appears that she may have had discussions with Defendants' underwriting representatives, including Timothy Scott, Michael Gunty and Justin Weltscheff, related to Defendants' underwriting capacity:

> Q.      Was there any discussion that you had with again Mike, Tim, or Justin about capacity issues they had for Zone A exposures? Did that come up at all?
>
> A.      I think it probably did. I don't remember specifically, but it might have.
>
> Q.      Do you have any recollection of any of them saying to you we don't have capacity to provide $15 million of flood

15

coverage in Zone A?

> A.      Well, based on the fact that I asked for 15 [million] and
> then they quoted 10 [million] with the two zones, I'm sure they
> probably may have come back and said, well, can you try to
> do 15 [million] and they said they're max[ed].

Defendant's Exhibit E at 29-30.  From the context of this testimony, it appears that the agency issues with respect to Marsh and Penford may impact the question of whether Penford was informed of Defendants' underwriting capacity.  Additional evidence at trial will better position the court to address any relevance or foundational issues regarding this evidence.  Accordingly, the court **RESERVES RULING** on the admissibility of Defendants' underwriting guidelines and testimony on such guidelines.

### 2.      *Testimony of Peter Evans*

At trial, Defendants intend to offer the opinion of Peter Evans that Defendants acted reasonably in handling Penford's claims and making payments for covered losses.  Penford asks the court to bar Evans' testimony.  Penford contends that Evans should not be permitted to testify regarding the meaning of the policy language, particularly what losses are captured by the policy's sublimits, because he has "no experience that could qualify him as an expert regarding the meaning of the . . . language at issue."  Penford Motion at 12.  Penford also argues that Evans' opinions regarding Penford's bad faith claim are inadmissible because they are unverifiable.

### a.      *Meaning of policy language*

Defendants agree that Evans should not be allowed to "opine about the meaning of the sublimits."  Defendants' Resistance at 16.  Accordingly, Penford's Motion is **GRANTED** to the extent it seeks to bar Evans from testifying as to the meaning of certain policy language, including the sublimits.

### b.      *Bad faith opinions*

Penford argues that Evans' bad faith opinions are unverifiable because they are not

based on anything other than Evans' "word" and are therefore inadmissible. Penford's Motion at 15. The court disagrees. As with Penford's expert, Jolstad, Evans' opinions regarding Defendants' alleged bad faith are based on his extensive experience in the insurance industry, particularly as a loss adjuster. The court finds Evans to be sufficiently qualified as an expert on the handling of insurance claims based on his knowledge, skill and experience. Fed. R. Evid. 702. The court also declines to exclude Evans' opinions based on Penford's contention that they cannot be measured against any "authoritative body of governing principles." Penford's Motion at 14. Penford's arguments are appropriate subjects for cross-examination or the presentation of contrary evidence, such as opinion testimony from its own bad faith expert. *See Robinson*, 447 F.3d at 1100 ("'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'") (quoting *Daubert*, 509 U.S. at 595).

Penford also asks the court to bar Evans' bad faith testimony because he purportedly failed to apply the appropriate standard for bad faith under Iowa law. As previously stated, a plaintiff may prevail on a bad faith claim if he or she can show that "the insurer 'lacked a reasonable basis for denying or delaying payment of the claim.'" *Schuller*, 2005 WL 2259993, at *14. Evans testified that the claims handling process should be judged by "objective standards of reasonableness." Deposition of Peter Evans ("Evans Dep.") (docket no. 75-14), at 7. He later described the standard as "promptness and reasonableness." *Id.* at 8. Evans' report includes his opinion that Defendants did not "unreasonably" delay payments. Penford's Exhibit 9 (docket no. 75-10), at 7. The court finds that Evans' opinion is sufficiently based upon the correct standard for bad faith claims under Iowa law. Accordingly, Penford's Motion is **DENIED** to the extent it seeks to bar Evans' testimony regarding Penford's bad faith claim.

### 3. *Michael Webster's expert opinions*

Penford seeks to bar certain opinions of Defendants' damages expert, Michael Webster. Specifically, Penford argues that Webster "improperly bases a portion of his business interruption calculation for Penford upon a pre-flood revenue projection and the allegedly unfavorable 'market conditions,' instead of relying solely upon Penford's historical revenues and costs." Penford Motion at 16. According to Penford, any opinions that "are not based upon Penford's historical revenues and expenses should be excluded." *Id.* Defendants argue that Webster properly considered the effects of the recession on demand for Penford's products. They contend that these effects must be considered under both the policy language and the general principles of business interruption coverage, which is intended to do for the business "what the business would have done had no flood occurred[.]" Defendants' Resistance at 14 (citing *Nw. States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531, 534 (8th Cir. 1966)).

The policy at issue in the instant action provides that:

> [I]n determining the amount of loss payable, the [insurers] will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY.

Penford's Exhibit 20 (docket no. 75-21), at 36. The policy also provides that Penford may recover lost earnings only to the extent that it is "able to demonstrate a loss of sales for the operations, services or production prevented." *Id.* at 37. Thus, Webster's consideration of Penford's business experience after the period of liability appears to comport with the plain language of the policy.

Penford cites *Catlin Syndicate Ltd. v. Imperial Palace of Miss., Inc.*, 600 F.3d 511 (5th Cir. 2010) in support of its argument. In *Imperial Palace*, the Imperial Palace casino shut down for several months following Hurricane Katrina. *Id.* When it reopened, its revenues were much greater than before the hurricane, because many nearby casinos remained closed. *Id.* Imperial Palace claimed $80 million in business interruptions losses,

18

while the insurer calculated $6.5 million.  *Id.*  The policy at issue in *Catlin* provided:

> Experience of the business—In determining the amount of the Time Element loss as insured against by this policy, due consideration shall be given to experience of the business before the loss and probable experience thereafter had no loss occurred.

*Id.* at 513.  The insurer argued that Imperial Palace's recovery "should be based on net profits Imperial Palace would probably have earned if Hurricane Katrina had not struck the Mississippi Gulf Coast and damaged its facilities."  *Id.*  Imperial Palace argued that "the correct hypothetical was not one in which Hurricane Katrina did not strike at all; it was one in which Hurricane Katrina struck but did not damage Imperial Palace's facilities."  *Id.*  In other words, Imperial Palace based its business interruption losses on a hypothetical in which the hurricane struck its competitors, but not itself.

Relying on its precedent interpreting a virtually identical provision, the Fifth Circuit Court of Appeals rejected Imperial Palace's argument and held that, "in the business-interruption provision at hand, only historical sales figures should be considered when determining loss, and sales figures after reopening should not be taken into account."  *Id.* at 516.  The Fifth Circuit Court of Appeals reasoned that "'historical sales figures reflect a business's experience before the date of the damage or destruction and predict a company's probable experience had the loss not occurred,' and that 'the strongest and most reliable evidence of what a business would have done had the catastrophe not occurred is what it had been doing in the period just before the interruption.'"  *Id.* at 514 (quoting *Finger Furniture Co. v. Commonwealth Ins. Co.*, 404 F.3d 312, 314 (5th Cir. 2005)).

The court finds that the reasoning that directed the outcome in *Imperial Palace* is not applicable here.  Imperial Palace based its lost earnings calculation, at least in part, on the fact that it experienced increased revenues because it reopened before most other casinos in the area.  600 F.3d at 512.  This is why the Fifth Circuit Court of Appeals characterized Imperial Palace's calculations as being based upon a hypothetical in which

"Hurricane Katrina struck but did not damage Imperial Palace's facilities." *Id.* Webster's consideration of market conditions, including the recession, is not analogous. In fact, consideration of such factors appears to be in accord with the argument that the Fifth Circuit Court of Appeals ultimately accepted: that the insured's recovery should be based on the profits that it "would probably have earned if Hurricane Katrina had not struck the Mississippi Gulf Coast and damaged its facilities." *Id.* at 513. Here, unfavorable market conditions, such as a recession, would have affected Penford's earnings regardless of whether the flood ever occurred. Accordingly, they are relevant to the question of what Penford's likely revenues would have been in the absence of the flood.

The court agrees with Defendants that:

> The issue raised in *Imperial Palace* is how to treat the wider geographic consequences of a catastrophic event when the event directly impacts the insured's property and the wider geographic consequences indirectly impact the insured's business. That simply is not the case here where the flood event which caused direct physical loss and damage is quite distinct from the worst economic catastrophe to befall the nation since the Great Depression. Penford does not get to recover what it would have earned in the absence of both the flood and the recession; it gets only what it would have earned in the absence of the flood.

Defendants' Resistance at 14-15. Business interruption coverage is "'designed to do for the insured . . . just what the business itself would have done if no interruption had occured—no more.'" *Nw. States Portland Cement Co.*, 360 F.2d at 534 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Anderson-Prichard Oil Corp.*, 141 F.2d 443, 445 (10th Cir. 1944)). Accordingly, Penford's Motion is **DENIED** to the extent it seeks to bar those portions of Webster's opinions that are based on something other than Penford's historical revenues and expenses.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED:**

(1)     The Motions (docket nos. 74 and 75) are **GRANTED IN PART, DENIED IN PART AND RESERVED IN PART** as discussed above; and

(2)     The parties must not directly or indirectly refer to or elicit answers from witnesses on the prohibited subjects.   Each party is charged with responsibility of cautioning its witnesses as to the substance of this Order.

**IT IS SO ORDERED.**

**DATED** this 17th day of June, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA